**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| |
|---|
| **ANTHONY MORANGELLI, et al., individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br>**COMPLAINT**<br>-against-<br><br><br>**CHEMED CORPORATION and ROTO-ROOTER SERVICES COMPANY,**<br><br>**Defendants.** |

**1:10-CV-00876 (BMC)**

**BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Respectfully submitted,

s/ Michael J.D. Sweeney

Michael J.D. Sweeney (MS 7959)
Carol Richman (CR1256)
Ed Tuddenham, of counsel (on the brief)
Getman & Sweeney PLLC
9 Paradies Lane
New Paltz, NY 12561
Telephone: (845) 255-9370
Fax: (845) 255-8649
msweeney@getmansweeney.com

Brent Pelton (BP 1005)
PELTON & ASSOCIATES
111 Broadway, 9th Floor
New York, NY 10006
Telephone: (212) 385-9700
Fax: (212) 385-0800
pelton@peltonlaw.com

*Attorneys for plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

I.     STATEMENT OF THE CASE............................................................1

II.    EVIDENCE IN SUPPORT OF CLASS CERTIFICATION .....................3

       A. Business Expenses Borne By Technicians ................................3

       B.  Time-Keeping.............................................................5

       C.  Uncompensated Time......................................................6

       D.  Altering of Time Records ................................................7

       E.  Deductions From Pay ...................................................10

ARGUMENT ...............................................................................11

       I.  RULE 23(a) REQUIREMENTS ARE MET ...........................11

       A.  Numerosity.............................................................11

       B.  Common Questions......................................................12

       C.  Typicality .............................................................12

       D.  Adequacy of Representation ...........................................13

II.    RULE 23(b)(3) REQUIREMENTS .......................................14

       A. Common Questions Predominate ......................................14

              1.  Failure to Pay State Minimum Wage
                  Because of Business Expenses........................................14

              2.  Uncompensated Hours of Work........................................16

                     (a)  Liability Questions Are Common ...........................17

                     (b)  Damages Issues .......................................21

              3.  Illegal Deductions ...............................................22

       B.  Class Treatment Is Superior.........................................23

CONCLUSION ............................................................................25

# TABLE OF AUTHORITIES

Cases:                                                                         Page(s):

*Amchem Products, Inc. v. Windsor,* 521 U.S. 591(1997) ......................................14

*Anderson v. Mt. Clemens Pottery,* 328 U.S. 680 (1946)................................ 21-22

*Becher v. Long Island Lighting Co.,* 164 FRD 144 (E.D.N.Y. 1996) ..................14

*Brennan v. General Motors Acceptance Corp.,*
 482 F.2d 825 (5th Cir. 1973) ...............................................................................18

*Consolidated Rail Corp. v. Town of Hyde Park,*
 47 F.3d 473 (2d Cir. 1995)...................................................................................11

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,*
 502 F.3d 91 (2d Cir. 2007)...................................................................................13

*Cruz v. Hook-Superx,* No. 09 Civ. 7717(PAC),
 2010 WL 3069558 (S.D.N.Y. Aug. 5, 2010)......................................................25

*Donovan v. Hudson Stations, Inc.,* No. 77-2172No. 77-2173
 1983 WL 2110 (D. Kan. Oct. 14, 1983) ........................................................ 21-22

*Donovan v. New Floridian Hotel,* 676 F.2d 468 (11th Cir. 1982).........................21

*Donovan v. Sovereign Security, Ltd.,* Civ. 81-0615,
 1982 WL 2192 (E.D.N.Y. Apr. 28, 1982) ...........................................................17

*Frank v. Goldn Plump Poultry,* No. 04-CV-1018 (PJS/RLE).
 2007 WL 2780504 (D. Minn. Sept. 24, 2007)................................................19, 25

*Gortat v. Capala Brothers, Inc.,* 07 CV 3629,
 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) ...................................................13, 14

*Guzman v. VLM, Inc.,* 07 CV 1126,
 2008 WL 597186 (E.D.N.Y. Mar. 2, 2008)...........................................................24

*In re Energy Sys. Equipment Leasing Sec. Litig.,*
 642 F.Supp. 718 (E.D.N.Y. 1986) .......................................................................25

*In re Nassau Co. Strip Search Cases,* 416 F.3d 219 (2d Cir. 2006) ...................15

*In re Visa Check Anti Trust Litigation,* 280 F.3d 124 (2d Cir. 2001)...................16

*Inniss v. Tandy Corp.,* 7 P.3d 807, 811 (Wash. 2000).........................................19

*Jankowski v. Castaldi,* 01CV0164,

2006 WL 118973 (E.D.N.Y. Jan. 13, 2007) .......................................................13, 24

*Kopec v. GMG Const.,* 2010 Wl 2925210 (E.D.N.Y. 2010) ...............................19

*Marisol A. v. Guiliani,* 126 F.3d 372 (2d Cir. 1997) ..............................................12

*Martin v. Selker Brothers,* 949 F.2d 1286 (3d Cir. 1991)......................................18

*McLaughlin v. Dial America Marketing, Inc.,* 716 F.supp. 812 (D.N.J. 1989) .....21

*McLaughlin v. Ho Fat Seto,* 8590 F.2d 586 (9th Cir. 1988)...................................21

*Myers v. Hertz Corp.*, 02 Civ. 4325,
2007 WL 2126264 (S.D.N.Y. July 24, 2007) ......................................................12

*Moore v. Paine Webber, Inc.,* 306 F.3d 1247 (2d Cir. 2002) ................................14

*Nascembeni v. Quayside Place Partners*
2010 WL 2351467 (S.D.Fla. 2010) .......................................................................19

*Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 346 (S.D.N.Y. 2004) .........24

*Reich v. Southern New England Telecommunications Corp.,*
121 F.3d 58 (2d Cir. 1997)........................................................................ 17, 19-22

*Rivera v. Brickman, Civ.* No. 05-1518, 2008 WL 81570
(E.D. Pa. Jan. 7, 2008) ...........................................................................................15

*Robidoux v. Celani,* 987 F.2d 931 (2d Cir. 1993).................................................12

*Roto-Rooter Services Co. v. Dep't of Labor,* 219 Conn. 520 (1991) ....................19

*Said v. SBS Electronics, Inc.,* No. CV 08-3067(RJD)(JO)
 2010 WL 1265186 (E.D.N.Y. Feb. 24, 2010).......................................................19

*Shabazz v. Morgan Funding Corp.*, No. 07 Civ. 0126(VM)
2010 WL 2505485 (S.D.N.Y. June 9, 2010) ...................................................16, 25

*Steinberg v. Nationwide Mutual Ins. Co.,* 224 F.R.D. 67 (E.D.N.Y. 2004) ..........16

*Toure v. Cent. Parking Sys.,* No. 05 Civ. 5237(WHP)
2007 WL 2872455 (S.D.N.Y. Sept. 28, 2007)........................................................12

*Trinidad Breakaway Courier Systems, Inc.,* No. 05CV4116,
2007 WL 103073 (S. D. N. Y. Jan. 12, 2007) ........................................................12

*Westerfield v. Wash Mut. Bank.,* No. 06-CV-2817,
2007 WL 2162989 (E.D.N.Y. Jul. 26, 2007)..........................................................24

*Wren v. RGIS Inventory Specialists,* 256 F.R.D. 180 (N.D. Cal. 2009) ...............25

<u>Statutes</u>

13 NCAC 12.305 ............................................................................3

56 Ill Admin. Code §§210.100 *et seq.* ........................................2

56 Ill Admin.Code §§ 300.700 et seq. and 300.800 *et seq.* .....................................3

820 Ill. Comp. Stat. §§105/1 *et seq.*........................................................3

 820 Ill. Comp. Stat.§115/1 *et seq.*........................................................3

CA IWC Wage Order 4.................................................................2, 19

Cal. Bus. & Prof. Code §§17200 *et seq.* ...............................................2, 3

Cal. Labor Code §§ 221, 510, 1182.12, 1194, 2802 ...........................................2, 3

Colo. Min. Wage Order 7 C.C.R. 1103-1 and Orders 23-26 ...........................2, 19

Colo. Rev. Stat. §§ 8-4-105, 8-6-101 *et seq.*...........................................2, 3

Conn. Gen. Stat. §§ 31-58 *et seq.,* 31-71, and 31-73 ...........................................2, 3

Fla. Const. Art. X §24...........................................................2

Fla. Statutes §§448.01 *et seq.* .......................................................2

HI Rev. Stat. §§387-1 *et seq.* and §§388-1 *et seq.*.................................................2, 3

Ind. Code §§ 22-2-2-1 *et seq.,* §§ 22-2-6-1 et seq., and 22-2-8-1 et seq. .............2, 3

Minn. Rules 5200.0090 and 5200.0150 ...........................................2, 3

Minn. Stat. Ann. §177.21 *et seq.*, §§177.24 and 181.79.....................................2, 3

N.C. Gen. Stat. §§95-25.6 *et seq.*.......................................................3

N.J.A.C. §§12:56-1 *et seq.* ...........................................................2

N.J.S.A.§§34:11-4.4; and 34:11-56a *et seq.* ...........................................3

N.Y. Labor Law Art. 6 & 19, including §§193 and 198-b .................................. 2, 3

Ohio Rev. Code Ann. §§4111.03, 4113.15 and 4113.19 ...................................2, 3

Rev. Code of Wash. §§49.46.005 *et seq.,* §§49.52.010, and 49.52.060. ............2, 3

Rule 23(a)...........................................................................................................11, 13

Rule 23(b)3 ...........................................................................2, 1, 12, 14, 23, 25

Wash. Admin. Code §§296-126-025, 296-126-026..........................................2, 3

Plaintiffs move to certify their state law claims as Rule 23(b)(3) class actions on behalf of all individuals who worked as commissioned technicians for Defendants in the following 13 States:  New York, New Jersey, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Minnesota, North Carolina, Ohio, and Washington.

## I.  STATEMENT OF THE CASE

This Fair Labor Standards Act (FLSA) collective action and state law class action was filed on February 23, 2010. Rec. Doc No. 1.  A Second Amended Complaint was filed October 13, 2010. Rec. Doc. No. Doc 145.  Plaintiffs are commissioned technicians employed by Defendants Roto-Rooter Services Company and its parent corporation, Chemed Corp., to provide residential and commercial plumbing repair and maintenance services. (Plaintiffs are hereinafter referred to as "Plaintiffs" or "Technicians").  Defendants (collectively referred to as "Roto-Rooter") operate 50 branch locations throughout the United States.

In their Second Amended Complaint the Plaintiffs allege that Defendants violated their rights to minimum wage and overtime under the Fair Labor Standards Act (FLSA):

> 1.  By imposing business expenses on Technicians that had the effect of bringing their wages below the FLSA minimum ("business expense claim"); and,
>
> 2.  By failing to compensate Technicians in compliance with the FLSA for all hours of work, including but not limited to, time spent at meetings, conducting administrative work, and maintaining their vans and work equipment ("uncompensated hours claim").

The Plaintiffs allege that these same two actions also violated the corresponding State minimum wage and overtime laws in the States where they worked.  Plaintiffs also allege that Defendants violated certain State wage payment laws by:

> 3.  Taking deductions from the Plaintiffs' wages in violation of State law ("illegal deductions claim").

1

By Order of June 17, 2010, this Court certified Plaintiffs' two FLSA claims as a

nationwide collective action on behalf of a class defined as:

> All persons who worked as commissioned technicians for
> Defendants between February 25, 2007 and the present.

Rec. Doc. No. 65.[1]  Notice of the collective action was issued and, to date, more than 420

individuals, including the named Plaintiffs, have opted-into the FLSA collective action.

Thirteen named Plaintiffs who worked in the States of New York, New Jersey,

California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Minnesota, North Carolina,

Ohio, and Washington now move for class certification of their State law claims.  Ten of these

individuals (all but the Florida, Hawaii, and North Carolina representatives) move for class

certification of all three of the State law claims identified above.   The representatives from

Florida and Hawaii seek certification of the State minimum wage and/or overtime claims only –

i.e. claim 1 (business deductions) and 2 (uncompensated hours). The representative of North

Carolina seeks certification of the illegal deduction claim only.[2]   Roto-Rooter operates a total of

---

[1]  Technicians who signed an agreement to arbitrate their labor disputes with Roto-Rooter (i.e. Arbitration Agreement version "A") are excluded from the FLSA class. Rec. Doc. No. 103 at 2, 6.  Plaintiffs do <u>not</u> include these individuals in their State law Rule 23 classes either.

[2]  Specifically Plaintiffs allege that Defendants' practice of (1) imposing unreimbursed business expenses on Plaintiffs that brought their wages below the State minimum, and (2) not paying for all hours of work violated the following State minimum wage and overtime laws: ***New York***:  N.Y. Labor Law Art. 6 & 19; NY Labor Law § 193; ***New Jersey***:  N.J.S.A.§§ 34:11-4.4; 34:11-56a *et seq.*; N.J.A.C. §§12:56-1 *et seq.*; ***California:*** Cal. Labor Code §§ 510, 1182.12, 1194, 2802; Cal. Bus. & Prof. Code §§17200 *et seq.*, and IWC Wage Order 4; ***Colorado:*** Colo. Rev. Stat. §§8-4-105, 8-6-101 *et seq.,* and Colo. Minimum Wage Order 7 C.C.R. 1103-1 and Orders 23-26; ***Connecticut:***  Conn. Gen. Stat. §§31-58 *et seq.*; ***Florida:*** Fla. Statutes §§448.01 *et seq.*, and Fla. Const. Art. X §24; ***Hawaii:*** HI Rev. Statutes §§387-1 *et seq.*; ***Illinois:*** 820 Ill. Comp. Stat. §§105/1 *et seq.*, 56 Ill Admin. Code §§210.100 *et seq.*; 56 Ill. Admin. Code §§ 300.700 et seq.   ***Indiana:***  Ind. Code §§ 22-2-2-1 *et seq.*; ***Minnesota:*** Minn. Stat. Ann. §177.21 *et seq.* and Minn. Rules 5200.0150*; **Ohio:*** Ohio Rev. Code Ann. §4111.03; ***Washington:***  Rev.

2

37 branch offices in the 13 states for which Plaintiffs seek class certification and more than 1200

class members have worked in those branches during the relevant State law limitations period.[3]

## II.  EVIDENCE IN SUPPORT OF CLASS CERTIFICATION

As set forth in Plaintiffs' brief in support of their motion to certify the FLSA collective

action, Rec. Doc. No. 17-1 (which is incorporated herein by reference along with the evidence

submitted in support of that motion), all Technicians paid by commission held identical jobs and

performed similar, if not identical, job duties. *See* Rec. Doc. No. 30, Sander Declaration at ¶¶ 5-

6; Exh. K, Deposition of Gary Sander, October 29, 2010 ("Sander Depo.") at 26-34. All such

Technicians were subject to the same nationwide pay and record-keeping policies and all

Technicians recorded their work time in the same way.  Sander Depo. at 30-31.

### A.  Business Expenses Borne By Technicians

Roto-Rooter required Technicians to bear certain expenses related to their work.

Technicians were required to purchase the van they would use. Exh. A, Roto-Rooter Field

---

Code of Wash. §§49.46.005 *et seq.,* Rev. Code Wash., §§ 49.52.010 *et seq.,* and Wash. Admin.
Code §§296-126-025, 296-126-026.

Plaintiffs allege that Defendants took deductions from their contract wages that were
prohibited by the following State laws:  *New York:*  NY Labor Law §§193 and 198-b; *New
Jersey:*  N.J.S.A. §§34:11-4.4; *California:*  Cal. Labor Code §§2802, California Labor Code
§221, Cal. Bus. & Prof. Code §§17200 *et seq.*; *Colorado:* Colo. Rev. Stat. §8-4-105;
*Connecticut:*  Conn. Gen. Stat. §§ 31-71, and 31-73; *Hawaii:* HI Rev. Stat. §388-1 *et seq.;*
*Illinois:* 820 Ill. Comp. Stat.§115/1 *et seq.,* 56 Ill. Admin.Code §§ 300.700 et seq. and 300.800 et
seq.; *Indiana:*  Ind. Code §§ 22-2-6-1 et seq. and 22-2-8-1 et seq.; *Minnesota:* Minn. Stat. Ann.
§§177.24 and 181.79 and Minn. Rules 5200.0090; *North Carolina:* N.C. Gen. Stat. §§95-25.6 *et
seq.*, 13 NCAC 12.305*; Ohio:* Ohio Rev. Code Ann. §§4113.15 and 4113.19; *Washington:*  Rev.
Code of Wash. §§49.52.010, 49.52.060.

[3]  The number of branch offices is as follows: New York-5; New Jersey-2; California-1;
Colorado-2; Florida-5; Hawaii-1; Illinois-5; Indiana-1; Minnesota-2; North Carolina-2; Ohio-6;
Washington-3. Exh. M, Branch Office List . *See footnote* 5 for the number of potential class
members.

Policies and Procedure Manual, Policy ("Policy") No. 475 at BSN 5004-05; Sander Depo. at 45.

The van had to be of a certain age, size, color, and condition specified by Roto-Rooter. Sander

Depo. at 48:-52; Exh. B, Policy No. 290. Technicians were also required to customize the van

according to Roto-Rooter's specifications, including installing a separation cage between the

driver's seat and the cargo area.  Sander Depo. at 291-292, Exh. C, Service Technician's

Regulations, BSN 269, at ¶ 7.  Technicians were required to maintain the van to standards set by

Roto-Rooter. Sander Depo. at 27; Exh. D, Vehicle Inspection Report.  Roto-Rooter inspected the

vans regularly to ensure compliance with this requirement. Sander Depo. at 83-86.  Plaintiffs'

Exh. D, Vehicle Inspection Report.  Technicians were also required to carry $500,000 worth of

insurance on the van and pay for its operation, including gas, tolls, and parking.  Exh. C at ¶ 5;

Sander Depo. at 267-269, 292 . Technicians were also required to pay for equipment, parts, and

tools used to perform their work.  Exh. A, Policy No. 475 at BSN 5004-05; Sander Depo. at 292-

293, 310.  The commissions paid to Technicians were calculated from two components:  an

expense component equal to a fixed 15% of the charge to the customer and a labor component

that varied depending on the job performed. *See, e.g.*, Exh. C, Morangelli Technician

Compensation Agreement at BSN 270.  Although this was the manner in which commissions

were calculated, Roto-Rooter did not reimburse specific expenses nor did it even require

Technicians to submit their expenses to Roto-Rooter.  If a Technician did not submit expense

verifications, the entire commission, both the labor and the expense component, were paid to the

Technician as wages. Exh. A, Policy No. 475 at BSN 5004-05; *see, e.g.,* Exh. E, a sample of

Kennedy Weekly Drivers Report, showing no "substantiated expenses."  If a Technician chose to

submit verification of his expenses, Roto-Rooter would designate a portion of his weekly

4

commissions as "expense reimbursement" on the Technician's paycheck so that neither the Technician nor Roto-Rooter had to pay payroll taxes on that amount. Exh. A, Policy No. 475 at BSN 5004-05. This was simply an accounting label. however; Technicians did not receive anything extra for submitting expenses. They received only the commissions fixed by formula whether or not they submitted expense verifications. *Id.* at BSN 5005.

In short, the commissions paid were entirely independent of the actual expenses incurred by a Technician. In some weeks, the total commission was sufficiently high to ensure that Technicians received the minimum wage after accounting for their actual business expenses. But in other weeks those expenses were high enough to cut into the Technicians' minimum wage earnings. Ercole Decl. ¶ 12; Morangelli Decl. ¶¶ 6, 14; Sabas Decl.¶¶ 6, 11; Castillo Decl. ¶ 11; McMahon, Saint Juste, Gorman, and Poczok Decls. ¶¶ 6, 13; Hess Decl. ¶ 6; Kennedy, Cain, and Frazier-Smith Decls. ¶ 13. *See also* Exh. A, Policy 475 at BSN 5006; Sander Depo at 283-284, 317, 330; Rec. Doc No. 17-11, Weekly Drivers Reports (showing instances where Technicians' expenses exceeded the commissions minus the minimum wage). In those weeks, Roto-Rooter made no effort to increase the payments to Technicians to ensure that they received at least the minimum wage. Exh. A, Policy No. 475 at BSN 5006 (explaining that if the expenses exceed the commissions minus the minimum wage, the excess expenses will be carried over to another pay period); *see, e.g.*, Rec. Doc No. 17-11, Weekly Drivers Reports. Technicians simply had to subsist on less than minimum wage during those weeks.

**B. Time-Keeping**

Pursuant to national policy, all commissioned Technicians were assigned scheduled hours. Sander Depo. at 90. They clocked into Roto-Rooter's dispatch/time-keeping system at the

beginning of their shift and out at the end of their shift using a hand-held device. Rec. Doc. No.

30, Sander Decl. ¶12 . In addition to clocking in and out, Roto-Rooter required Technicians to

record when they accepted a job, arrived at a job, finished a job, and took lunch.  However, until

recently, Technicians were not able to record administrative, training or meeting time; only

someone in the branch office or dispatch could enter those times.  Sanders Depo. at 145-147.

All time entries, and changes to time entries, were recorded and coded in Roto-Rooter's

database.  Time associated with training, performing administrative work such as Turn In, or

attending a meeting – i.e. time that only the branch office or dispatch could enter – was supposed

to be coded "MT".  Sander Depo. at 120-123; *see* Exh. F, Time Data (BSN 2352), "Time Type"

column.

### C.  Uncompensated Time

As a national policy, Roto-Rooter did not compensate Technicians for the time they

spend maintaining their vans.  Sander Depo at 148-150.  Technicians were also required to

maintain their equipment, perform Turn In, and attend mandatory meetings.  Although Roto

Rooter admits this time was compensable, Plaintiffs allege that it was not recorded as

compensable time.  Declarations.  And Roto-Rooter's records support Plaintiffs' allegation.

At the end of each work week, between Tuesday afternoon and the end of the day on

Wednesday, Technicians were required to reconcile their invoices, receipts, and expenses and

present them to their branch office. Sander Depo at 56-57, 70-72.  This process was called

"Turn-In".  Sander Depo at 56-63.  In addition to turning in paper work, Technicians were

presented with a "Detailed Listing of Time" setting forth the time they recorded for the week,

and a "Preliminary Drivers Report" listing the revenues and commissions from the jobs they

6

performed.  Sander Depo at 57-63.  They were required to reconcile any issues with the Detailed

Listing of Time and sign a final version.  Sander Depo at 57-63; Exh. A, Policy 475 at  BSN 5002,

04-06.  Because they worked remotely, the-Turn In process was the only time many Technicians

regularly visited the branch office.  While they were there, they performed a number of other tasks,

including replenishing their inventory of parts, replacing elements of their safety kits, maintaining

and repairing equipment, subjecting their vans to inspection by management, taking inventory of

the parts on their vans, or attending training or meetings. Sander Depo at 72-74.

Representative Plaintiffs and former administrative personnel testify that the Turn-In

time was not recorded as work time on their time records.  Ercole and Frazier-Smith Decls. ¶ 29;

Morangelli Decl. ¶ 31; Hess, Kennedy, and Castillo Decls. ¶ 28; Saint Juste and Morangelli

Decls. ¶ 31; Cain, McMahon, Gorman, and Poczok Decls. ¶ 30; Sabas Decl. ¶ 27. As these

witnesses explain, the Turn-In process had to take place outside of the Technicians regularly

scheduled hours because during scheduled time they had to be available to respond to jobs,

which was not possible during the Turn-in process.  Ercole Decl. ¶ 28; Cain, Frazier-Smith,

McMahon, Gorman, and Poczok Decls. ¶ 29; Morangelli and Saint Juste Decls. ¶ 30; Castillo

and Sabas Decls. ¶ 27.  Roto-Rooter admits that time spent at Turn-In or mandatory meetings

should have been recorded and coded at "MT" time, but the only coded time records that Roto-

Rooter has provided so far show that Plaintiffs Morangelli and Ercole were not credited with MT

time for Turn-In each week.  Exh. F, Time Data, (BSN 2352).

### D.  Altering of Time Records

Each branch office was required to balance its books for the week by the end of the day

on Wednesday and to electronically transfer that information to the corporate offices.  Exh. L,

Deposition of Stephan R. Poppe, October 28, 2010 ("Poppe Depo.") at 24-26.  Prior to the transfer, branch personnel (but not Technicians) could make changes to Technicians' time records.  *Id.* at  68-70.  Once the branch office transfer is complete, branch personnel could no longer change records. *Id.* at 45.

Plaintiffs and former Roto Rooter branch administrators testify that Technicians' time records were altered to reduce overtime.  Ercole and Frazier-Smith Decls. ¶ 30; Cain, McMahon, Gorman, and Poczok Decls. ¶ 31; Morangelli and Saint Juste Decls. ¶ 32; Castillo and Hess Decls. ¶ 29. Several of the witnesses testify that they understood that regional management was aware of this practice. [4]  For example, Ms. Smalls, a former administrator and someone not otherwise in the action, testifies that the Westchester, NY branch altered Technician time records under the supervision of GM, Anthony D'Alessandro, who was also the GM for the Staten Island and Long Island branches.  Smalls Declaration at ¶¶ 4, 6-7.  Ms. Smalls understood that the direction to alter records came from the regional level. Smalls Declaration at ¶ 7.  Stephanie Sexton-Cain, an assistant to Don Perkins, one of the managers in Ohio, testifies that she was told to alter records by the Mr. Perkins.  Sexton-Cain Decl. ¶¶ 2, 7-8.  Ms. Sexton-Cain believed that the General Manager, Steve Perkins (Don's brother), also knew that time records were being changed, as did the Regional Manager, Mike Polyak.  *Id.* ¶¶ 3, 9.

Roto-Rooter's databases clearly show that Technicians' time records were altered.  Roto Rooter admits that not only are changes to time records available in the databases, but so is the original time entry.  Sander Depo. at 235:20- 236:21; Poppe Depo. at 104:13-107:7.

---

[4] In Roto Rooter's management structure, branch managers report to regional managers who report to a national sales manager who reports directly to the Chief Operating Officer a senior vice president.  Roto Rooter has five regions in the United States.  Sander Depo. 16-17.

Determining how much time was lost as a result of an alteration is simply a matter of comparing the original entry with the changed entry.  *Id.*  For example, during the 30(b)(6) deposition, Roto Rooter's witness could determine from electronic records for that the time entries for three different jobs performed by Plaintiff Ercole in one week had been altered to show only one to three minutes of work on those jobs – jobs for which Roto-Rooter charged the customer hundreds of dollars.  Sanders Depo at 230:2 to 241:10. Unable to provide a reason for the anomalies, the witness admitted that they could be the result of time shaving.  Sander Depo. at 240:9-241:10.  That shaving of hours can be determined from the database was confirmed by the 30(b)(6) witness testimony that he determined time records were being altered in Connecticut by reviewing information from the Company's databases.  Sander Depo. at 154-155, 161-163, 185-86, 235-36.

Roto-Rooter confirms hour shaving in other ways.  As early as August of 2007, Chemed's Internal Audit and Compliance department was aware of allegations that Roto-Rooter's Orlando, FL branch management was altering employee records to reduce overtime pay.  Exh. G, selected Exh. G, Internal Audits at BSN 4801-02.  On January 10, 2008, Chemed's Director of Internal Audit and Compliance, Eric Eaton, reported that compelling testimony supported employee allegations of "willful and deliberate alteration of employee hours for the purposes of reducing overtime pay and thereby increasing the profitability of the operation" in the Company's Columbus, Ohio branch. *Id.* at BSN 4807. On May 12, 2009 Eaton reported that Roto-Rooter was engaged in "fraudulently reducing technician's hours worked ... in an effort to reduce premium pay expense" in its Atlanta office.  *Id.* at BSN 4785.

Roto-Rooter was aware that the practice went beyond the Atlanta, Orlando, and Columbus offices.  *See e.g. id.* at BSN 4785.  Roto-Rooter's 30(b)(6) witness testified that Roto-Rooter was sued by employees in Connecticut around 2008 for altering time records.  Sander Depo. at 154-155, 161-163.  An investigation of Roto-Rooter's electronic time records confirmed the practice. *Id*. at 185-86, 235-36.  The findings were reported to the Roto Rooter's COO, Rick Arquilla.  Sander Depo at 156:5-25.   By May 2009, the New York State of Labor had notified Roto-Rooter of allegations of the practice in New York.  Exh. I, Roto-Rooter letter to NYS DOL,  BSN 4834-36.

Despite the findings of its Internal Audit and Compliance department, Roto-Rooter took no steps to prevent the practice.  After confirming fraud in Atlanta, Eaton concluded, the practice was "not an isolated incident" and noted that "no controls or processes are planned to identify or prevent intentional and fraudulent manipulation of time records."  Exh. G, selected Internal Audits at BSN 4785.  And Mr. Austin, the GM of the Atlanta branch at the time of the Internal Audit, remains the General Manager of that office. *See* Exh. H, Atlanta Branch Web Page (available at http://www.rotorooter.com/atlanta/).  The 30(b)(6) witness could offer no steps that Roto-Rooter took to prevent the practice prior to the filing of this case.  Sander Depo. at 181:5-186:20;  198:15-204:11.  The total failure to address the practice of shaving hours suggests that Roto-Rooter management acquiesced in the practice, if it did not actively encourage it, and helps to explain the widespread nature of the practice.

### E.  Deductions From Pay

As a matter of national policy, Roto-Rooter reserved the right to "reverse" commissions previously paid to Technicians for a variety of reasons including call backs (i.e. when it was

necessary to send a technician to re-do warranty work), bad debts resulting from returned

customer checks, refunds paid to customers, and use of coupons by customers.   Exh. J,

Employee Handbook, Reversal of Commissions, BSN 1257, Sander Depo. at 262:22-263:8.   No

written authorizations for these "reversals" of commission payments are obtained prior to

making the reversal. Plaintiffs allege that these deductions violated State wage payment laws.

## ARGUMENT

## I.  RULE 23(a) REQUIREMENTS ARE MET

### A.  Numerosity

Rule 23(a)(1) requires the prospective class to be "so numerous that joinder of all

members is impracticable."  The Second Circuit has recognized that "numerosity is presumed at

a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d

Cir. 1995).  All of the proposed classes easily meet this standard with the exception of California

and Hawaii as is evidenced by the fact that FLSA class notices were sent to more than 60

individuals in each of those states.[5]  Hawaii also meets the presumptive numerosity standard

because, although only 27 FLSA notices were issued, the Hawaii state law claims carry a six-

year statute of limitations rather than the three years applicable to FLSA claims. Roto-Rooters'

admission of a turnover rate between 31% and 60% over the Hawaii class period suggests that

the Hawaii state law class is greater than 50. Sander Depo at 44:6-45:11.  Only 28 notices were

issued in California, although the class is likely larger than that because California labor law

---

[5] Notice was sent to the following number of individuals in each of the States at issue:
New York: 165; New Jersey:  84; California: 28;  Colorado: 65; Connecticut: 72: Florida: 135
Hawaii:  27;  Illinois:  138; Indiana: 79; Minnesota:  88;  N. Carolina: 71;  Ohio:  283;
Washington: 62.

claims carry a four-year, rather than a three-year limitations period.  In any case, in light of the

fact that the California class members' claims parallel the FLSA claims that the Court will be

deciding in any event, and in light of the difficulties class members would have in maintaining

individual suits over the relatively small amounts at issue here, a finding that joinder of the

California class members is impracticable is appropriate.  *See Robidoux v. Celani,* 987 F.2d 931,

935 (2d Cir. 1993) (impracticality of joinder depends on the circumstances of the case, not on

mere numbers); *Toure v. Cent. Parking Sys.,* 2007 WL 2872455 at *6 fn 2 (S.D.N.Y. 2007)

(court would certify State law claims that parallel FLSA claims for class of 23-25 because

"judicial economy would be served by hearing all overtime claims in one action.")

### B.  Common Questions

"Generally courts have liberally construed the commonality requirement to mandate a

minimum of one issue common to all class members." *Myers v. Hertz Corp.*, 02 Civ. 4325,  2007

WL 2126264 at *4 (S.D.N.Y. July 24, 2007) *quoting Trinidad Breakaway Courier Systems, Inc.,*

No. 05CV4116, 2007 WL 103073 at *5 (S.D.N.Y. Jan. 12, 2007).  Because Plaintiffs must show

under Rule 23(b)(3) that common questions not only exist but that they predominate, the issue of

common questions will be dealt with below in the discussion of Rule 23(b)(3).

### C.  Typicality

"[T]ypicality requires that 'the claims of the class representative be typical of those of the

class, and is therefore satisfied when each member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove defendant's liability.'"

*Myers,* 2007 WL 2126264 at *6 *quoting Marisol A. v. Guiliani,* 126 F.3d 372, 376 (2nd Cir.

1997).  However, "[t]here is no requirement that the precise factual circumstances of each class

12

plaintiff's claim be shared by the named plaintiff." *Gortat v. Capala Broths., Inc.*, 07-CV-3629, 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010).  As is made clear in the Second Amended Complaint and the affidavits of the class representatives attached hereto, each of the class representatives alleges the same violations based on the same underlying actions of Roto-Rooter and the same Labor Code provisions as the members of his particular state class.[6]  Thus each class representatives claims are typical of the claims of the individual members of his class.

### D.  Adequacy of Representation

Rule 23(a)(4) requires that (1) class representatives demonstrate that they have no interests that are antagonistic to the proposed class members and (2) class counsel be qualified. *Jankowski v. Castaldi,* 01CV0164, 2006 WL 118973 at *3-4 (E.D.N.Y. Jan. 13, 2007).  To meet the adequacy of representation requirement, the class representative must "be a part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents."  *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir. 2007).  The class representatives meet these requirements.  They are clearly members of the classes they seek to represent in that they are past or present Roto-Rooter Technicians who did not sign version "A" of the Arbitration Agreement, they suffered the same injury as the absent class members and have the same interest in redressing those injuries.  There are no conflicts between the class representatives of each State class and the members of the class; all share a common interest in proving the claims alleged.  *In re Visa Check Anti Trust Litigation,* 280 F.3d 124, 144-145 (2d Cir. 2001).  The fact that some of the representatives are

---

[6]  Although all of the class representatives raising claim 2 allege hour shaving based on Defendants' widespread practice, not all can attest to it from personal knowledge.  Plaintiffs have requested the database records from Roto-Rooter to prove the allegation for these individuals but so far Roto-Rooter has only produced those records for Morengelli and Ercole.

former employees in no way makes them antagonistic to the interests of current employee class members in a case such as this where a make whole remedy of back wages is sought.  *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 152 (E.D.N.Y. 1996).

As set forth in the declaration of Michael J.D. Sweeney, Plaintiffs' counsel are experienced in handling large class actions and fully qualified to pursue this action.

## II.  RULE 23(b)(3) REQUIREMENTS

Rule 23(b)(3) requires that common questions "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for the fair and efficient adjudication of this controversy."  Plaintiffs satisfy both of these requirements.

### A.  Common Questions Predominate

The requirement that common questions predominate tests whether the proposed classes "are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997).  Predominance is satisfied only if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. Paine Webber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002).   To determine whether common questions exist, it is necessary to analyze each of the three claims for which certification is sought.

1.  Failure to Pay State minimum Wage Because of Business Expenses:

This claim parallels Plaintiffs' first FLSA claim. The claim alleges that, in certain work weeks, Roto-Rooter reduced Technicians wages below the required State (and federal) minimum wage by shifting business expenses to Technicians and failing to reimburse those expenses up to

the applicable minimum wage level within the work week in which they were incurred.   The factual underpinnings of this claim are established by Roto-Rooter's national pay policy that required all Technicians to pay business expenses associated with their work, but that did not take the actual expenses incurred into account when paying Technicians.   Rather Roto-Rooter paid Technicians a pre-set commission formula regardless of the actual expenses Technicians incurred each week. As a result of this policy, in certain work weeks, Technicians' actual expenses were sufficiently high that they did not earn the minimum wage.

This uniform pay policy raises a common legal question for each of the state classes – i.e. whether Roto-Rooter's failure to reimburse Technicians' actual business expenses up to the minimum wage level constitutes an evasion of State minimum wage requirements.   This is precisely the same question that is raised by Plaintiffs' FLSA action and it is clearly appropriate for class treatment.   *See, e.g., Rivera v. Brickman,* Civ. No. 05-1518, 2008 WL 81570 (E.D. Pa. Jan. 7, 2008) (FLSA collective action holding that failure to reimburse employee incurred business expenses up to the minimum wage level violates the FLSA).   As the Second Circuit has made clear "when plaintiffs are 'allegedly aggrieved by a single policy of defendants' such as the blanket policy at issue here, the case presents 'precisely the type of situation for which the class action device is suited' since many nearly identical litigations can be adjudicated in unison." *In re Nassau Co. Strip Search Cases,* 461 F.3d 219, 228 (2d Cir. 2006).

Not only are the liability questions related to this claim common to the class, the resulting damages can also be calculated on a class-wide basis by applying a common damage formula to Roto-Rooter's records.   The commissions paid each week appear in Roto-Rooter's payroll records as do most of Technicians' business expenses.   The few expenses not recorded in

15

the payroll records are recorded elsewhere, Sander Depo at 250:22-252:5, or in records of the

individual drivers.  A Technician's damages for any given work week can be calculated from

these records simply by subtracting the expenses incurred from his total commissions for the

week to determine the extent to which his earnings fell below the minimum wage. The same

calculation can be made for class members who did not submit substantiated expenses to Roto-

Rooter based on the records they kept for tax purposes.  Ercole Decl. ¶ 12; Morangelli Decl. ¶

14; McMahon, Gorman, Poczok, Kennedy, Cain and Hess, Decls. ¶ 13. Even if some testimony

were required to prove the expenses of these Technicians, where common questions of law and

fact predominate with respect to liability, as they do here, the existence of individual questions

as to damages is generally unimportant. *See, In re Visa Check Antitrust Litig.,* 280 F.3d 124, 136

(2d Cir. 2001) (if common issues predominate as to liability, court should ordinarily find

predominance even if some "individualized damage issues" exist); *Shabazz v. Morgan Funding*

*Corp.,* 07-Civ. 0126, 2010 WL 2505485 (S.D.N.Y. June 9, 2010) ("Any class action based on

unpaid wages will necessarily involve calculations for determining individual class member

damages, and the need for such calculations do not preclude class certification."); *Steinberg v.*

*Nationwide Mut. Ins. Co.,* 224 F.R.D. 67, 80 (E.D.N.Y. 2004).

    2.  <u>Uncompensated Hours of Work</u>

      This claim parallels Plaintiffs' second FLSA claim alleging that Roto-Rooter failed to

pay minimum wage and overtime for all hours of work.   Specifically, Plaintiffs allege that Roto-

Rooter failed to pay Technician's for time spent maintaining vans and equipment and attending

turn-in and meetings.  Plaintiffs also allege that Roto-Rooter had a widespread practice of

altering time entries (or encouraging workers to falsify time entries) to reduce overtime.   These claims raise common issues both with respect to liability and damages.

(a)  Liability Questions Are Common

With respect to van maintenance time, Roto-Rooter admits that, as a matter of national policy common to the class, it did not pay for such time.  Thus the factual predicate of that claim is common to the class.

With respect to turn-in, meetings and equipment maintenance, Roto-Rooter claims that there was a national policy to pay for such time but admits that, prior to the filing of this lawsuit, only branch personnel or dispatchers were able to record such time; Technicians could not do it for themselves.  Plaintiffs allege that, as a matter of widespread practice, Roto-Rooter did not record the turn-in and meeting times.  Plaintiffs will prove this practice through two kinds of generalized class-wide proof.  First, they will call representative Technicians to testify that turn-in and meetings were not, and could not be, performed during scheduled time because of Roto-Rooter's policy that Technicians be ready, able and willing to respond immediately to calls during scheduled time.  These witnesses will also provide direct testimony of a widespread practice of not paying for such time in any other way.  *Id.*  Courts commonly allow workers to prove the existence of a company-wide pattern and practice of uncompensated hours through the testimony of a limited number of representative witnesses.  For example, in *Reich v. So. New England Telecom. Corp.,* 121 F.3d 58, 66-68 (2d Cir. 1997), the Second Circuit affirmed a finding that 1500 workers had uncompensated hours based on the testimony of only "thirty nine employees [2.5%], accounting for each of the five job categories in question."  Similarly in *Donovan v. Sovereign Security, Ltd.,* Civ. 81-0615, 1982 WL 2192 (E.D.N.Y. Apr. 28, 1982),

17

the court found that representative testimony was sufficient to establish a pattern and practice of shaving overtime hours both for the testifying employees as well as non-testifying employees. *See also Martin v. Selker Brothers,* 949 F.2d 1286, 1298 (3d Cir. 1991) (representative testimony of employees at some of defendant's gas stations was sufficient to establish a pattern and practice of uncompensated hours at all of defendant's gas stations including stations where none of the employees testified); *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825, 829 (5th Cir. 1973) (testimony of representative workers sufficient to establish defendant systematically discouraged all affected workers from reporting overtime).

Of course Plaintiffs need not rely solely on representative testimony to establish that Roto-Rooter failed to pay for equipment maintenance, turn-in, and meetings.  Plaintiffs can also use Roto-Rooter's own time records to establish that such worktime, which occurred  outside their scheduled hours, was not recorded.  As Roto-Rooter explained, only branch personnel or a dispatcher could record such time, and they were required to code it appropriately. Sanders Depo 145-147.  Time spent training, performing administrative work such as Turn In, or attending a meetings should have been coded "MT." *Id*.  Thus, time outside a Technician's scheduled time that was properly recorded and compensated will be apparent in Roto-Rooter's time records. The absence of such entries coupled with Roto-Rooter's policies and the testimony of Plaintiffs' witnesses will establish, on a class-wide basis, that it is more likely than not that such time was not paid for at least for those class members who show no weekly time entries coded as "MT." For example, Plaintiffs Ercole and Morangelli state that they were required to perform Turn In each week but were not paid for it.  Ercole Decl. ¶¶ 28-29;  Morangelli Decl. ¶¶ 30-31.  The time records that have been produced confirm that they were not compensated for "MT" time each

18

week.  *See* Exh. F, Time Data (BSN 2352), "Time Type" column.  Defendants have yet to

produce the time records for the remainder of the class, but Plaintiffs anticipate that they will

bear out the testimony of a widespread practice of non-payment.

The legal question whether time spent in turn-in, meetings, and servicing one's van and

equipment constitutes compensable "work time" is also common to the class as a whole.  The

State minimum wage laws at issue define hours worked in a manner similar to the FLSA or look

to FLSA rulings as a basis for defining hours worked.[7]  Thus, if the time spent on van and

equipment maintenance, turn-in, and meetings are considered 'hours worked' for purposes of the

Plaintiffs' FLSA claims, those hours will, necessarily, be hours worked for the class members.

The claim that there were additional hours of uncompensated time because of Roto-

Rooter's widespread practice of shaving hours to reduce overtime can also be established

through generalized proof.  As with the Turn In this claim will be proven through the testimony

of representative Technicians and other witnesses coupled with Roto-Rooter's payroll records.

Even though discovery has just begun, Plaintiffs have already amassed compelling testimony of

widespread shaving of hours.   In addition to the affidavits of the class representatives submitted

---

[7] *Compare So. New England Telecom.,* 121 F.3d at 64 (discussing meaning of "work" for purposes of FLSA) *with. Kopec v. GMG Const.,* 2010 Wl 2925210 (E.D.N.Y. 2010) (provisions of NYLL are similar to the FLSA); *Said v. SBS Electronics, Inc.,* 2010 WL 1265186 at *3 (E.D.N.Y. 2010) (NYLL mirrors the FLSA in most respects); Cal.Wage Order 4-2001 2(k) (definition of 'hours worked'); Colo. Min. Wage Order 26 2 (definition of 'time worked'); *Roto-Rooter Services Co. v. Dep't of Labor,* 219 Conn. 520, 528 n. 8 (1991) (federal law may be used to interpret Connecticut minimum wage provsions analogous to FLSA); *Nascembeni v. Quayside Place Partners,* 2010 WL 2351467 *3 fn 2 (S.D.Fla. 2010) (Florida minimum wage laws are interpreted consistent with the FLSA); Ill. Admin. Code § 210.110 (definition of 'hours worked'); *Franks v. Gold'n Plump Poultry, Inc.,* 2007 WL 2780504 at *1 (D. Minn. 2007) (referring to Minn. minimum wage statutes as a "mini-FLSA"); *Inniss v. Tandy Corp.,* 7 P.3d 807, 811 (Wash. 2000) (when construing provisions of Washington minimum wage act court may consider interpretations of comparable FLSA provisions as persuasive authority).

with this motion, Defendants' own Internal Audit and Compliance Department found compelling evidence of "wilful and deliberate alteration of employee hours for the purposes of reducing overtime pay and thereby increasing the profitability of the operation," Exh. G, Internal Audits at BSN 4807, and that Roto-Rooter was engaged in "fraudulently reducing technician's hours worked . . . in an effort to reduce Premium Pay expenses." *Id*. at BSN 4785.   Former office administrators from New York and Ohio testify that they were required to alter time records by their managers and that the practice was well-known and widespread.  Smalls Declaration at ¶¶ 4, 6-7; Sexton-Cain Decl. ¶¶ 2-3, 7-9. Roto-Rooters Internal Audit and Compliance department confirmed that the practice of shaving hours was "not an isolated incident".  Moreover, the Internal Audit noted that Roto-Rooter had  "no controls or processes [ ] planned to identify or prevent intentional and fraudulent manipulation of time records,"  Exh. G, Internal Audits at BSN 4785.  Roto-Rooter offered no steps that it took prior to the filing of this case to prevent the practice of shaving hours.

As noted above, Plaintiffs can establish that hours shaving occurred on a class-wide basis using only representative testimony.  *See, e.g., So. New England Telecom. Corp.,* 121 F.3d at 66-68.[8]  However, Plaintiffs do not need to rely solely on the representative testimony to establish the practice of shaving hours.  Plaintiffs here can prove the precise extent of hours shaving from Roto-Rooter's electronic records. Roto-Rooter has confirmed that its databases are sufficiently detailed to show the practice and the extent of shorting hours.  Sander Depo. at 154-155, 161-163, 185-86, 235:20- 236:21.

---

[8]  Even in an individual action, an employee would likely call numerous witnesses to establish the widespread nature of hours shaving in order to demonstrate that it was more likely than not that his claim of hours shaving is true.  It would be far more efficient to call the witnesses necessary to prove a pattern and practice of shorting hours in one litigation rather than in hundreds of individual cases.

(b)  Damages Issues

While Plaintiffs need not show that the damages present common questions, nevertheless, the uncompensated maintenance, Turn-In, and meeting time can be established through representative testimony without the necessity of testimony from each class member. As the Supreme Court has made clear, employees should not be penalized because an employer has not kept records of work time.  Rather, in those circumstances damages may be awarded as long as the employees come forward with sufficient evidence "to show the amount and extent of [the] work as a matter of just and reasonable inference."  *Anderson v. Mt. Clemens Pottery,* 328 U.S. 680, 687-88 (1946).   This remains true even if the damage calculations are only "approximate." *Id.* at 688.   As a corollary of this principle, courts have long recognized that it is not necessary for every single affected employee to testify in order to prove his damages.  As the cases cited above make clear, the testimony of representative employees is sufficient, not only to prove liability, but to establish the approximate uncompensated time for all affected employees. *See, Id.,* 328 U.S. 680 (testimony of 8 employees established damages for 300 employees);  *So. New England Telecom.,* 121 F.3d at 69-70 (representative testimony of 2.5% of workers was sufficient to support damage award to all workers); *McLaughlin v. Ho Fat Seto,* 850 F.2d 586 (9th Cir. 1988) (testimony of 5 workers established damages for 28 workers) *cert denied* 488 U.S. 1040 (1989); *Donovan v. New Floridian Hotel,* 676 F.2d 468 (11th Cir. 1982) (23 workers testified on behalf of 207 receiving award); *McLaughlin v. Dial America Marketing, Inc.,* 716 F.Supp. 812 (D.N.J. 1989) (testimony of 43 on behalf of 393 workers); *Donovan v. Hudson Stations, Inc.,* No. 77-2172, 1983 WL 2110 (D. Kan. Oct. 14, 1983) (FLSA damages awarded to more than 15,000 service station workers based on deposition testimony of 572 workers – 3.8%).

21

Relying on representative testimony to establish the average hours spent on unrecorded activities like van maintenance and turn in meetings is particularly appropriate where all of the affected employees drove similar vans and were required to meet the same van maintenance standards, and where all held the same positions and performed the same record-keeping activities at turn-in.  The time for such activities is likely to be similar for most employees and, to the extent Turn-in and maintenance practices differed in particular Regions or branch offices, in accord with *So. New England Telecom.,* 121 F.3d at 68, Plaintiffs can produce representative testimony for each different Region.  Individual testimony from each affected class member will not be necessary.

With respect to damages for shaving hours, as noted above, Plaintiffs can rely on Roto-Rooter's payroll records to demonstrate both the specific occasions where worker hours were shaved and the amount of time shaved.   However, even in the absence of such payroll records, the approximate time shaved from workers could be established through representative testimony in the same manner as the time spent in van and equipment maintenance, Turn-In, and meetings. Roto Rooter should not be able to make such time effectively unrecoverable simply by alleging that it varies too much to allow for common calculation.  *Mt Clemens Pottery,* 328 U.S. at  688.

3. <u>Illegal Deductions</u>

This claim asserts that Roto-Rooter violated State wage payment laws when it reversed previously paid commissions for such reasons as (1) customer bad checks or stop-payments; (2) call-backs for warranty service, and (3) refunds issued to customers complaining about service. The factual underpinnings of this claim are common to each class because Roto-Rooter's Employee handbook makes clear that these reversals apply the same way in any given State. Thus, if any member of a State class is subject to reversals for, say, bad checks, all members of the

class will be subject to that reversal policy.  The only issue presented by this claim is the common

legal issue of whether the deduction is permissible under state law.  Damages for these violations

can be established on a class-wide basis from payroll records where all the deductions appear.

Thus, common factual and legal questions predominate with respect to all three of the

State law claims alleged by Plaintiffs.

**B.  Class Treatment Is Superior**

Rule 23(b)(3) sets out four factors bearing on the question of superiority: (1) the extent to

which the class members have an interest in individually controlling the prosecution of their

claims; (2) the extent and nature of any litigation concerning the controversy already begun by

class members; (3) the desirability of concentrating the litigation in one forum; and (4) the likely

difficulties in managing the class action.  Plaintiffs will address each of these factors in turn.

(1) The class members have no interest in individually controlling the prosecution of

their claims.  In most cases, the amount of damages at issue is not large enough to make

individual actions possible.  Nor is individual control desirable, given the uniform nature of the

claims and the need to prove a pattern and practice to establish uncompensated hours, even in an

individual action.

(2) Pacer reveals no pending FLSA claims against Defendants and Plaintiffs are aware of

no such cases.  As a result, litigating the common issues raised by this case on behalf of a class

will achieve the judicial economy and efficiency that Rule 23 was designed to promote.   The

absence of other FLSA cases also tends to confirm that individual Technicians have neither the

interest nor the ability to bring the claims raised here as individual actions.

(3) Given the uniformity of the claims across the class, it is clearly desirable from the standpoint of efficiency and judicial economy to concentrate all of the claims in one forum. Certainly, class adjudication is far superior to the filing of dozens if not hundreds of separate actions all raising the same questions.  The superiority of class treatment from the point of view of efficiency and judicial economy is particularly great here as the Court will be resolving most of the factual and legal questions raised by the Rule 23 classes as part of its resolution of the previously certified FLSA collective action.

(4) Manageability:  Courts in this district have made clear that there are no manageability problems inherent in litigating FLSA collective action claims and Rule 23 State law claims together. *See, e.g., Gortat v. Capala Brothers, Inc.*, 07 CV 3629,  2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) (certifying FLSA collective action and New York Labor law claims under Rule 23); *Guzman v. VLM, Inc.,* 07 CV 1126,  2008 WL 597186 at *10 (E.D.N.Y. Mar. 2, 2008) (certifying State labor law claims in previously certified FLSA collective action);  *Westerfield v. Wash Mut. Bank.,* No. 06-CV-2817, 2007 WL 2162989 (E.D.N.Y. Jul. 26, 2007) (refusing to dismiss Rule 23 class claims under New York, California, Illinois and New Jersey State law filed in FLSA collective action); *Jankowski v. Castaldi,* 2006 WL 118973, at *9 (certifying claims under New York labor law in FLSA action); *Noble v. 93 University Place Corp.,* 224 F.R.D. 330, 346 (S.D.N.Y. 2004) (similar).

Nor are there manageability problems inherent in the fact that Plaintiffs seek to certify multiple State classes.  Courts frequently certify multi-State classes to adjudicate State law claims arising from the same nucleus of operative facts as an underlying FLSA claim.  *See, e.g., Cruz v. Hook-Superx,* 2010 WL 3069558 (S.D.N.Y. 2010) (certifying FLSA collective action

24

and refusing to dismiss State law classes allegations involving six State overtime laws and noting that variations in State law are minor and would not undermine the Court's ability to manage the six subclasses); *Shabazz,* 2010 WL 2505485 (certifying NY and NJ labor law classes in FLSA action); *Wren v. RGIS Inventory Specialists,* 256 F.R.D. 180 (N.D. Cal. 2009) (certifying four state labor law classes in FLSA collective action); *Frank v. Goldn Plump Poultry,* 2007 WL 2780504 (D. Minn. 2007) (denying motion to dismiss Minnesota and Wisconsin minimum wage claims in FLSA collective action).

The State minimum wage laws at issue here are similar in their requirements to the FLSA and are generally interpreted in light of the FLSA.  Thus a ruling on Plaintiffs' FLSA claims will, as a practical matter, determine their State wage claims as well making it highly efficient to consider all of those claims in the same action.   While Plaintiffs' unlawful deduction claim arises solely under State law, the fact that the claim arises out of the same nucleus of operative facts as Plaintiffs' FLSA claim making it efficient to dispose of it at the same time. *See, e.g., Wren,* 256 F.R.D. 180 (certifying unique state labor law claims arising from the same facts as the previously certified FLSA collective action).  Finally, the fact that the statute of limitations varies from State to State does not create management problems that would preclude the court from certifying the alleged classes.  *In re Energy Sys. Equipment Leasing Sec. Litig.,* 642 F.Supp. 718, 752-753 (E.D.N.Y. 1986); *Cruz,* 2010 WL 3069558 at *3.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs motion to certify State law classes pursuant to Rule 23(b)(3) should be granted.