UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                                                          :
ANTHONY MORANGELLI et al.,                                :
                                                          :
                          Plaintiffs,                     :    **MEMORANDUM**
                                                          :    **DECISION AND ORDER**
           -against-                                      :
                                                          :    10 Civ. 0876 (BMC)
CHEMED CORPORATION et al.,                                :
                                                          :
                          Defendants.                     :
                                                          :
--------------------------------------------------------- X

**COGAN,** District Judge.

This litigation is a collective action under the Fair Labor Standards Act ("FLSA"), as

well as a certified wage and hour class action under the laws of 14 states. Currently before the

Court are three motions: (1) plaintiffs' motion for summary judgment, (2) defendants' motion for

summary judgment and/or decertification of the class and collective actions, and (3) plaintiffs'

motion to amend the definition of the certified classes.

For the reasons set forth below: (1) plaintiffs' motion for summary judgment is denied,

(2) defendants' motion for summary judgment and/or decertification of the class and collective

actions is granted in part and denied in part, and (3) plaintiffs' motion to amend the definition of

the certified classes is denied.

## BACKGROUND

Defendant Roto-Rooter Services Co. ("RRSC") operates Roto-Rooter, a business which

provides plumbing repair and maintenance services to residential and commercial customers.

Defendant Chemed Corp. ("Chemed") is the indirect parent corporation of RRSC.[1]

---

[1] More specifically, Chemed is the parent company of Roto-Rooter Group, Inc., which, in turn, is the parent
company of RRSC.

Roto-Rooter has 50 branches, approximately 110 company-owned service locations, and employs over 1,600 technicians nationwide. Plaintiffs are employed as technicians for Roto-Rooter. They provided drain cleaning and plumbing services for Roto-Rooter's customers and are compensated on a commission basis. The commissions that technicians received were based on the amounts they collected or billed, as well as the type of work they performed, less certain costs, such as outside labor and insurance surcharges.

Plaintiffs allege that a number of Roto-Rooter policies violated the FLSA and the wage and hour laws of the states in which they worked. They assert three categories of claims. *First*, plaintiffs claim that Roto-Rooter required them to bear business expenses that had the effect of bringing their wages below the applicable minimum wage. This category of claims is labeled as the "Business Expense Claims." *Second*, plaintiffs allege that Roto-Rooter failed to compensate them for all hours they worked, including time shaved from their actual working hours and time spent at "turn-in." "Turn-in" is a weekly process during which technicians review their time records for accuracy and submit records of their expenses, receipts, and money orders for that week. This category of claims is labeled as the "Uncompensated Hours Claims." *Third*, plaintiffs allege that Roto-Rooter violated state law by taking deductions from plaintiffs' wages for call-back work for warranty service. This category of claims is labeled as the "Illegal Deductions Claims."

In June 2010, the Court certified a FLSA collective action on the Business Expense and Uncompensated Hours Claims.[2] Subsequently, in a Memorandum Decision and Order dated June 16, 2011 (the "Class Certification Order"), the Court certified 14 state law class actions for

---

[2] Plaintiffs did not assert the Illegal Deductions Claims under the FLSA, nor could they have.

liability purposes only based on the three categories of claims.[3] Since then, the Court has amended or modified the definitions of several classes.

At the time the instant motions were filed, 432 plaintiffs, representing approximately 48 branches in 25 states, had opted-in to assert FLSA claims. Notice of the certified class actions was sent to approximately 1,971 current and former Roto-Rooter technicians. At the time the instant motions were filed, 3 technicians had opted not to participate in this litigation. Further, the parties designated 39 technicians, including all of the named plaintiffs and several opt-in plaintiffs, as "Discovery Plaintiffs" for purposes of representative discovery.

Additional facts relevant to the instant motions will be set forth in greater detail below, as they relate to each of the motions and arguments at issue.

## DISCUSSION

Plaintiffs have moved for summary judgment on four grounds, namely: (1) that defendants' policy of shifting expenses to plaintiffs violates the FLSA and state minimum wage laws when it has the effect of bringing earnings below the applicable minimum wage; (2) that defendants violated their record-keeping duties under the FLSA; (3) that defendants' taking of wage deductions for warranty call-back work violates state laws regulating wage deductions; and (4) that plaintiffs are entitled to liquidated damages under the FLSA for defendants' alleged minimum wage violations. Separately, defendants have moved for decertification or dismissal of the Business Expense, Uncompensated Hours, and Illegal Deductions Claims. Finally, defendants move for summary judgment on all claims against Chemed, arguing that it cannot be liable because it was not plaintiffs' employer.

---

[3] The states are: New York, New Jersey, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Minnesota, Missouri, North Carolina, Ohio, and Washington. A total of 34 branches in these states are represented. North Carolina plaintiffs do not assert Business Expense or Uncompensated Hours Claims, while Florida and Hawaii plaintiffs do not assert Illegal Deduction Claims.

# I. The Summary Judgment Standard

A court may grant summary judgment if the moving party shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted).

On the other hand, in order "[t]o survive summary judgment . . . the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Reiseck v. Universal Commc'ns of Miami, No. 06 Civ. 777, 2012 WL 3642375, at *2 (S.D.N.Y. Aug. 23, 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11, 106 S. Ct. 1348, 1355 n.11 (1986)). However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact[,]" Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), and the "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. Anderson, 477 U.S. at 252, 106 S. Ct. at 2512.

# II. Chemed's Liability

In their summary judgment motion, defendants argue that the claims against Chemed should be dismissed because there is no evidence that Chemed acted as plaintiffs' employer under the FLSA and the applicable state labor laws.

Only an "employer" may be liable under the FLSA, <u>Herman v. RSR Sec. Servs., Ltd.</u>, 172 F.3d 132, 139 (2d Cir. 1999), which defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). The Supreme Court has noted the "expansiveness" of the FLSA's definition of "employer." <u>Falk v. Brennan</u>, 414 U.S. 190, 195, 94 S. Ct. 427, 431 (1973). <u>See also Carter v. Duchess Cmty. Coll.</u>, 735 F.2d 8, 12 (2d Cir. 1984) (observing that the FLSA is a "remedial" statute, "written in the broadest possible terms so that" its provisions "would have the widest possible impact in the national economy."). The relevant states use definitions of "employer" that are similar to the FLSA definition.[4]

In determining whether an entity can be considered an "employer," "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." <u>Herman</u>, 172 F.3d at 139 (internal citations omitted). Courts applying the "economic reality" test consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." <u>Reiseck</u>, 2012 WL 3642375, at *3 (quoting <u>Carter</u>, 735 F.2d at 12). These factors are not exhaustive and no single factor is

---

[4] <u>See Hart v. Rick's Cabaret Int'l Inc.</u>, No. 09 Civ. 3043, 2010 WL 5297221, at *2 (S.D.N.Y. Dec. 20, 2010) ("Courts applying both the FLSA and the New York Labor Law have concluded that the standards by which a court determines whether an entity is an 'employer' under the FLSA also govern that determination under the New York [L]abor [L]aw."). <u>See also Flemming v. REM Conn. Cmty. Servs. Inc.</u>, No. 11-cv-689, 2012 WL 6681862 (D. Conn. Dec. 21, 2012); <u>Davis v. Four Seasons Hotel Ltd.</u>, 810 F. Supp. 2d 1145 (D. Haw. 2011); <u>Radford v. Telekenex, Inc.</u>, No. C10-812RAJ, 2011 WL 3563383 (W.D. Wash. Aug. 15, 2011); <u>Knapp v. City of Markham</u>, No. 10 C 3450, 2011 WL 3489788 (N.D. Ill. Aug. 9, 2011); <u>Arnold v. DirecTV, Inc.</u>, No. 10-cv-352, 2011 WL 839636 (E.D. Mo. Mar. 7, 2011); <u>Bates v. Smuggler's Enters., Inc.</u>, No. 10-cv-136, 2010 WL 3293347 (M.D. Fla. Aug. 19, 2010); <u>Ortiz v. Paramo</u>, No. 06-3062, 2008 WL 4378373 (D.N.J. Sept. 19, 2008); <u>McDonald v. JP Mktg. Assocs., LLC</u>, Civ. No. 06-4328, 2007 WL 1114159 (D. Minn. Apr. 13, 2007); <u>Mitchell v. Abercrombie & Fitch, Co.</u>, 428 F. Supp. 2d 725 (S.D. Ohio 2006); <u>Miller v. Colorcraft Printing Co., Inc.</u>, No. 03 CV 51-T, 2003 WL 22717592 (W.D.N.C. Oct. 16, 2003). <u>Cf.</u> Cal. Code Regs. tit. 8, § 11040(2)(F) and 7 Colo. Code Regs. § 1103-1:2 (containing definitions of 'employer' that are different from – but, for current purposes, compatible with – the FLSA definition). Indiana law will be addressed separately in Section III.B, <i>infra</i>.

determinative. Rather, the test "encompasses the totality of the circumstances." Herman, 172

F.3d at 139. Further, "[o]fficers and owners that do not directly supervise workers may

nonetheless be deemed employers under the FLSA where 'the individual has overall operational

control of the corporation, possesses an ownership interest in it, controls significant functions of

the business, or determines the employees' salaries and makes hiring decisions.' Reiseck, 2012

WL 3642375, at *3 (quoting Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184,

192 (S.D.N.Y. 2003)).

    Defendants do not contest that RRSC was plaintiffs' employer. Indeed, defendants point

to a number of RRSC's employment policies in their motion. Instead, defendants argue that

Chemed cannot be considered an "employer" for liability purposes because it is merely RRSC's

indirect parent company and the record demonstrates that Chemed was not involved in RRSC's

day-to-day business operations, particularly with regard to compensation and time-keeping.

    Plaintiffs, on the other hand, claim that Chemed and RRSC "are two nominally separate

entities that are actually part of a single integrated enterprise." They rely on the "single

employer" or "integrated employer" doctrine, which provides that "[t]o prevail in an

employment action against a defendant who is not the plaintiff's direct employer, the plaintiff

must establish that the defendant is part of an 'integrated enterprise' with the employer, thus

making one liable for the illegal acts of the other." Parker v. Columbia Pictures Indus., 204 F.3d

326, 341 (2d Cir. 2000). See also Addison v. Reitman Blacktop, Inc., 283 F.R.D. 74, 84

(E.D.N.Y. 2011) (applying the "integrated employer" doctrine in a FLSA case). The "integrated

employer" doctrine applies in "extraordinary circumstances" where plaintiff demonstrates

"sufficient indicia of an interrelationship between the immediate corporate employer and the

affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated

corporation is jointly responsible for the acts of the immediate employer." Herman v. Blockbuster Entm't Grp., 18 F. Supp. 2d 304, 308 (S.D.N.Y. 1998) (quoting Armbruster v. Quinn, 711 F.2d 133, 1337 (6th Cir. 1983)).[5]

In determining whether an integrated enterprise exists, courts consider "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Reiseck, 2012 WL 3642375, at *4 (quoting Cook v. Arrowsmith Shelburne Inc., 69 F.3d 1235, 1240 (2d Cir. 1995)). Although no single factor is required or determinative, "control of labor relations is the central concern." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996). "The 'integrated enterprise' analysis ultimately focuses upon whether the parent corporation was the final decision-maker with regard to the employment issue underlying the litigation." Takacs v. Hahn Auto. Corp., No. C-3-95-404, 1999 WL 33117265, at *4 (S.D. Ohio Jan. 4, 1999).

Although plaintiffs point to a number of ways in which RRSC and Chemed cooperate and interact, they do not cite sufficient evidence to raise a fact issue for the jury concerning Chemed's status as an "employer." First, with regard to the "economic reality" test, there is no dispute that Chemed did not hire, terminate, or discipline Roto-Rooter technicians or their supervisors. Although Chemed made recommendations concerning certain compensation policies, RRSC held ultimate decision-making authority over compensation and time-keeping policies for technicians. Additionally, plaintiffs have not proffered any evidence suggesting that

---

[5] Defendants assert that the Court should not consider plaintiffs' "integrated employer" theory of liability because plaintiffs did not plead this theory. The issue is not so clear. The Third Amended Class Action Complaint alleges (1) that "Chemed owns and operates [RRSC]," (2) that "Chemed and RRSC employed Plaintiffs and participated directly in employment decisions regarding the Plaintiffs' rights for which they seek redress[,]" and (3) that "Defendants are individually and collectively an enterprise engaged in interstate commerce for the purpose of the FLSA." Although these allegations may be sufficient to have put defendants on notice that plaintiffs were invoking the "integrated employer" theory, the allegations also may be too conclusory to state a claim. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). The Court need not resolve these questions because it concludes that defendants are entitled to summary judgment on the merits of Chemed's "employer" status.

Chemed exercised control over technicians' work schedules or employment conditions. See Gorey v. Manheim Servs. Corp., 788 F. Supp. 2d 200, 210 (S.D.N.Y. 2011) (dismissing corporate parents under the "economic reality" theory where there was no evidence that the parents hired or fired plaintiffs, or controlled their work schedules, employment conditions, or rate of pay).

Second, with regard to the "integrated employer" doctrine, plaintiffs have not adduced sufficient evidence to allow a reasonable jury to conclude that Chemed exercised "control of labor relations" so as to make it a single, integrated enterprise with RRSC. Plaintiffs attempt to create a fact issue by citing a statement on the investor relations page of Chemed's website to argue that "Chemed's main business purpose is RRSC's – to provide plumbing and drain cleaning repair and maintenance services to residential and commercial markets through RRSC." But this is plainly a selective reading that ignores Chemed's ownership of a healthcare business.

Based on this record, a jury could not reasonably infer that Chemed and RRSC have coextensive business purposes. Although plaintiffs point to the fact that RRSC employees are required to abide by Chemed's business ethics and information security policies, those policies have nothing to do with the employment matters at issue in this litigation. Nor can plaintiffs raise a jury issue based on the fact that RRSC and Chemed share a number of high-level managers. The law is clear that "the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer." Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 403 (S.D.N.Y. 1999) (quoting Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997)).

Plaintiffs' arguments based on the services which Chemed provided to RRSC are also unavailing. There is nothing remarkable about the fact that Chemed and RRSC employees

participate in common savings and retirement plans. See, e.g., Duffy v. Drake Beam Morin, No. 96 Civ. 5606, 1998 WL 252063, at *5 (S.D.N.Y. May 19, 1998) ("that Harcourt General administers the pension and benefit plans for its subsidiaries, including DBM, is hardly uncommon, nor is it proof that Harcourt General made the employment decisions at issue here."). Nor does the fact that Chemed audited RRSC suggest that Chemed was responsible for the employment decisions at issue in this litigation, especially since Chemed had an obligation under the Sarbanes-Oxley Act to conduct audits and monitor for fraud. See generally Gonzalez v. HCA, Inc., No. 1:10-00577, 2011 WL 3793651, at *13 (M.D. Tenn. Aug. 25, 2011) ("Whatever administrative functions HCA management provides as the parent corporation, the [other defendants, including subsidiaries] decide and implement the pay and scheduling policies.")

At the end of the day, plaintiff can only rely on a handful of facts to suggest that Chemed and RRSC are an integrated enterprise, namely that Chemed and RRSC have offices in the same building and that Chemed issued the check for damages when RRSC was found liable in a previous labor action. But these facts do not imply that Chemed was "the final decision-maker with regard to the employment issue underlying the litigation." Takacs, 1999 WL 33117265, at *4. In comparison to defendants' evidence that Chemed was not involved in RRSC's employment decisions, the facts relied on by plaintiffs amount to nothing more than a "scintilla of evidence" in support of their claim that Chemed is plaintiffs' employer, see Anderson, 477 U.S. at 252, 106 S. Ct. at 2512, and are inadequate to raise a fact issue for the jury to decide. Therefore, the Court grants defendants' summary judgment on Chemed's status as an "employer" and dismisses the claims against Chemed in the FLSA and state law actions.

## III. State-Specific Issues

### A. The Business Expense and Uncompensated Hours Claims Under Hawaii Law

Defendants argue that plaintiffs may not assert their Business Expense Claims for periods after July 24, 2009 or any claims for Uncompensated Hours under Hawaii law because of peculiar features of that state's labor law. Under Haw. Rev. Stat. § 387-1, an employee gets the benefit of either the FLSA or the Hawaii minimum wage and overtime provisions, whichever are better, but if they are the same, then the FLSA applies.[6]

The class period for the Hawaii state law class is February 25, 2004 to the present. Throughout that entire period, both Hawaii law and the FLSA have prescribed that overtime must be paid for workweeks in excess of 40 hours. See 29 U.S.C. § 207(a)(1); Haw. Rev. Stat. § 387-3(a). See also In re Wal-Mart Wage & Hour Emp't Practices Litig., 490 F. Supp. 2d 1091, 1129 (D. Nev. 2007) (noting that, pursuant to § 387-1 "unless the FLSA sets a longer workweek than Hawaii law, § 387-3 does not apply to any employee otherwise covered by the FLSA" and holding that because "§ 387-3 does not provide a shorter maximum work week, the FLSA applies and § 387-3 does not."). Although Hawaii's minimum wage was higher than the FLSA minimum wage prior to July 24, 2009, as of that date both minimum wages were set at $7.25 an hour. Compare 29 U.S.C. § 206(a)(1), with Haw. Rev. Stat. § 387-2.

In response, plaintiffs argue that they asserted their Business Expense and Uncompensated Hours Claims under Chapter 388 of the Hawaii Wage and Hour Law, in addition to Chapter 387, and that § 387-1's restriction on the definition of "employee" does not apply to claims brought under Chapter 388. See Haw. Rev. Stat. § 388-1. Plaintiffs rely on §

---

[6] More precisely, Haw. Rev. Stat. § 387-1 explicitly excludes from the definition of "employee" any person for whom "the minimum wage which may be paid the employee or the maximum hours which the employee may work during any workweek without the payment of overtime, are prescribed by the [FLSA]", unless Hawaii law establishes a higher minimum wage or a shorter threshold for overtime.

388-2(a) which requires employers to "pay all wages due to the employer's employees" on regular semimonthly paydays.

Plaintiffs' argument is unavailing. The Court agrees with defendants that § 388-2(a) "addresses only *when* wages are payable, not *whether* they are payable."[7] Indeed, Chapter 388 governs the *payment* of wages and compensation, not what those wages should be. The gravamen of plaintiffs' Business Expense and Uncompensated Hours Claims is not a complaint about the manner in which their wages were paid, but is, instead, that defendants did not pay them what they were due – an issue covered by Chapter 387. Plaintiffs have not cited any provision of Chapter 388 that governs the minimum wage or overtime compensation due to plaintiffs and the Court is not aware of any. Accordingly, the Court dismisses the Hawaii state law class's Business Expense Claims for periods after July 24, 2009 and its Uncompensated Hours Claims.

B. The Business Expense and Uncompensated Hours Claims Under Indiana Law

Like Hawaii, Indiana's Minimum Wage Law also limits the scope of its coverage through the use of definitions. But Indiana law focuses on the definition of "employer," rather than "employee." The Indiana Minimum Wage Law explicitly excludes from its definition of "employer" "any employer who is subject to the minimum wage provisions of the [FLSA]." Ind. Code. Ann. § 22-2-2-3. Courts have commented that "[o]ne of the main effects of this provision in Indiana Law is the exclusion of large employers from the purview of state law." Bailey v. Wal-Mart Stores, Inc., No. IP 00-1398-C-B/S, 2001 WL 1155149, at *2 (S.D. Ind. Sept. 29, 2001). See also Parker v. Schilli Transp., 686 N.E.2d 845, 850 (Ind. Ct. App. 1997) ("because [defendant] was an employer within the meaning of the [FLSA] and is subject to that statute, it is

---

[7] Further, courts have concluded that "Hawaii did not intend for an implied right of action under § 388-2 or § 388-7. Rather, Hawaii vests enforcement authority for these provisions in the director of labor and industrial relations." In re Wal-Mart Wage & Hour Emp't Practices Litig., 490 F. Supp. 2d at 1129-30.

not an 'employer' for purposes of the [Indiana] Wage Law, and [plaintiff's] claim [for unpaid overtime under Indiana law] fails.").[8]

Plaintiffs appear to concede that their claims cannot succeed under Indiana's Minimum Wage Law because of § 22-2-2-3 and argue instead that they should be allowed to amend their complaint to assert the Business Expense and Uncompensated Hours Claims under Indiana's Wage Payment Statute, § 22-2-5-1, *et seq.*, which does not contain the same limitation on the definition of "employer."

It is axiomatic that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). According to the Supreme Court:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Here, although the Indiana Wage Payment Statute bears facial similarity to the provision of Hawaii's law governing the frequency with which wages are paid, Indiana law is clear that "the Wage Payment Statute governs both the frequency and amount an employer must pay its employee." St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele, 766 N.E.2d 699, 703 (Ind. 2002). Plaintiffs' proposed amendment would not, therefore, be futile. See generally Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003) ("leave to amend a complaint need not be granted when amendment would be futile").

Although "[a] motion to amend a complaint is particularly disfavored where the amendment is proposed in response to a summary judgment motion[,]" Williams v. Bank Leumi

---

[8] Defendants are incorrect when they cite Parker for the proposition, expressed in dictum, that "in Indiana, claims for overtime compensation cannot be raised under the Wage Law." 686 N.E.2d at 851. Subsequent to Parker, Indiana amended its Minimum Wage Law to require the payment of an overtime premium for hours worked in excess of 40 per week. See Ind. Code. Ann. § 22-2-2-4(k).

Trust Co. of N.Y., No. 96 Civ. 6695, 2000 WL 343897, at *2 (S.D.N.Y. Mar. 31, 2000), the most important consideration in determining whether to allow amendment is prejudice to the opposing party. See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."). Although plaintiffs certainly should have brought their claims under the correct statute in the first instance or in their three amended complaints, defendants have made no showing of prejudice or bad faith. Plaintiffs, on the other hand, have persuaded the Court that their amended claims would be "mere variations" on the dismissed claims and would require no additional discovery. Therefore, the Court grants plaintiffs leave to amend in order to assert claims under § 22-2-5-1, *et seq.* and denies defendants' motion as to this claim as moot.

## C. California Plaintiffs' Claims

Defendants have moved for summary judgment on certain categories of claims asserted by California technicians. The categories overlap to some extent.

### 1. *The California Business Expense Claims*

Defendants request summary judgment on the FLSA and state Business Expense Claims for California technicians for claims covering the period after January 14, 2008. Defendants claim that "[p]laintiffs have not identified . . . a single week after January 14, 2008 in which a California technician contends he incurred business-related expenses that had the effect of bringing his wages below the minimum wage." The Court's examination of the evidence has likewise not revealed any weeks after January 14, 2008 for which a California technician failed to earn the minimum wage because of incurred business expenses. Plaintiffs fail to respond to this argument.

The law is clear that, on summary judgment, "the burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted). At this stage, "[t]he time has come" for plaintiffs "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Plaintiffs have not carried their burden.

To the extent that there is evidence on the record, that evidence suggests that Roto-Rooter's business expense policy did not cause California minimum wage violations during this period. Defendants cite a January 14, 2008 Roto-Rooter memorandum "Pay Considerations Unique to California" (the "California Memo"), which was to be implemented immediately. The California Memo states that "[i]n most cases" Roto-Rooter will provide technicians with their van. Further, defendants cite the testimony of plaintiff Castillo, the California class representative, that Roto-Rooter paid for his van and van-related expenses during the post-January 14, 2008 period. The California Memo also provides that certain technicians "are to be provided with uniforms, safety equipment, and all other equipment necessary for them to perform their jobs at Roto-Rooter's expense and without deduction to the technician." The California Memo emphasizes the absence of evidence to support plaintiffs' claims. Therefore, the Court grants defendants summary judgment on this issue and dismisses the California FLSA and state Business Expense Claims for dates after January 14, 2008.

### 2. The California Illegal Deductions Claims

Defendants seek summary judgment on the California Illegal Deductions Claims for dates after January 14, 2008. Defendants rely on the California Memo which states that "[c]ommissioned employees should not be charged for call backs," the absence of a call-back provision in the handbook for California employees, and testimony from plaintiffs that, in California, Roto-Rooter stopped making adjustments to commissions for call-backs and began paying technicians an hourly rate for their call-back work. Plaintiffs concede that their California Illegal Deductions Claims for this period cannot succeed. Accordingly, the Court grants defendants' motion for summary judgment on this issue and dismisses the California Illegal Deductions Claims for dates after January 14, 2008.

### 3. The Ita Release

The third category of California claims involves claims that, defendants argue, were released pursuant to the settlement of a separate class action. In 2007, a group of California Roto-Rooter technicians brought a class action captioned Ita v. Roto-Rooter Services Company in California state court, asserting state law claims. The Ita plaintiffs alleged, among other things, that RRSC: (1) "failed to pay Plaintiffs overtime wages for any and all work performed in excess of 8 hours per day and/or for any and all work performed in excess of 40 hours per week"; (2) "required Plaintiffs to expend their own monies to conduct their employers' business" and to shoulder . . . business expenditures which should have been borne by their employer"; and (3) "made various deductions from Plaintiffs' wages for certain items, including . . . customers call-backs[.]"

On August 6, 2008, the Ita court certified the class action and approved the settlement. The settling plaintiff class encompassed

all persons who are or were employed by [RRSC] as plumbers, sewer and drain technicians or employees [and] combination plumbing/sewer and drain technicians or employees . . . whether hourly-paid or commissioned, and with or without expenses, at any time from April 24, 2003 to May 19, 2008, the class period, in the State of California.

No one requested to opt-out of the Ita settlement and the court ordered that "each Class Member shall be deemed to have released defendants for any and all claims regarding the allegations of unpaid reimbursements and wages, interest and penalties through the date of entry of this Order."[9]  Pursuant to the settlement agreement that the Ita court approved, the members of the Ita class released RRSC, its "parent companies" and "affiliated companies" from:

all claims demands, rights, liabilities, and causes of action of every nature and description whatsoever arising out of, relating to, or in connection with the causes of action asserted in the Complaint, including, without limitation, any and all claims for alleged failure to pay overtime, waiting time, travel time, call back, missed meal and rest breaks, on-call time, charges for replacement of tools and equipment and time expended in call back due to customer complaint and other similar deductions from wages[.]

Defendants rely on the fact that the Ita complaint contained claims concerning "failure to pay overtime," "business expenditures which should have been borne by their employer," and "deductions from Plaintiffs' wages for certain items, including . . . deductions for . . . customer call-backs" to argue that members of the California class who were employed on or before May 19, 2008 are barred from asserting claims for any period prior to August 6, 2008.[10]  Plaintiffs, on the other hand, distinguish Ita from this action by pointing out that (1) the business expense claim in Ita was not alleged to have caused a minimum wage violation and (2) the failure to pay overtime claim in Ita did not encompass allegations that Roto-Rooter failed to compensate

---

[9] The California state class representative and the only Discovery Plaintiff from California both received payments as members of the Ita settlement class.

[10] Under 28 U.S.C. § 1738, federal courts must give a state court judgment approving a class action settlement "the same effect that it would have in the courts of the State in which it was rendered." Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 369, 116 S. Ct. 873, 876 (1996). "Federal courts may not employ their own rules . . . in determining the effect of state judgments but must accept the rules chosen by the State from which the judgment is taken." Id. 516 U.S. at 373, 116 S. Ct. at 877 (internal quotation marks omitted).

technicians for their "turn-in" time. Moreover, plaintiffs urge a narrower reading of the Ita release, arguing that the release only applies to claims related to the particular legal claims asserted in the Ita complaint.

Neither side is entirely correct. First, even though the Ita complaint did not contain specific allegations regarding "turn-in" time, it did allege that Roto-Rooter failed to compensate technicians for "time spent doing other company business for Defendant Roto-Rooter, during which time Plaintiffs were under the supervision and control of Defendant Roto-Rooter." Thus, despite plaintiffs' argument, the Ita complaint encompassed their "turn-in" claims. Second, the release encompasses "claims . . . arising out of, relating to, or in connection with the causes of action asserted in the Complaint." While plaintiffs argue that the term "cause of action" should mean the specific legal claims alleged in the complaint, California law supports a broader reading. "[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. . . . Even where there are multiple legal theories upon which recovery might be predicated, *one injury* gives rise to only one claim for relief." Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., 855 P.2d 1263, 1266 (Cal. 1993) (emphasis in original). "The 'cause of action' is to be distinguished from the 'remedy' and the 'relief' sought, for a plaintiff may frequently be entitled to several species of remedy for the enforcement of a right." Id. (quoting Big Boy Drilling Corp. v. Rankin, 213 Cal. 646, 649 (1931)). See also Villacres v. ABM Indus., Inc., 189 Cal. App. 4th 562, 576 (Cal. Ct. App. 2010) (describing, in the *res judicata* context, "cause of action" as based upon the harm suffered "regardless of the specific remedy sought or the legal theory (common law or statutory) advanced").[11] It is,

---

[11] Plaintiffs' reliance on the unreported decision in Garnica v. Verizon Wireless Telecom, Inc., No. 128577, 2011 WL 2937236 (Cal. Ct. App. July 21, 2011), is unavailing. The Garnica court construed a release of certain employment claims and held, unremarkably, that a court should look at the causes of action implicated in a suit in determining which claims were released. Garnica does not define 'cause of action.'

therefore, of no moment that the Ita complaint did not assert claims under the FLSA or the specific causes of action alleged here and the Ita release is applicable to plaintiffs' claims prior to August 6, 2008.

There are two exceptions. First, California technicians hired after May 19, 2008 do not fall within the scope of the Ita release. The second exception is plaintiffs' minimum wage claims. Plaintiffs are correct that the Ita complaint contains no allegations of minimum wage violations under federal or California law. Although the Ita plaintiffs did assert a claim for Roto-Rooter's failure to indemnify its employees for business expenses under the California Labor Code, that claim is not simply a separate theory or remedy for the same right as a minimum wage claim. Two distinct rights are at issue: an employee's right not to bear his employer's business expenses and an employee's right to earn a minimum wage. There was no "cause of action" for a minimum wage violation in Ita and, consequently, the Ita release does not bar plaintiffs' minimum wage claims here.

### 4. *Summary*

Since the above holdings overlap, some clarification as to which claims asserted by California plaintiffs have been dismissed and which survive is appropriate.

- California plaintiffs' FLSA and state law Business Expense Claims are dismissed for the period after January 14, 2008. The FLSA and state law Business Expense Claims otherwise survive.

- California plaintiffs' FLSA and state law Uncompensated Hours Claims are dismissed for the period prior to the August 6, 2008, because of the Ita release, except that claims asserted by California technicians hired after May 19, 2008 fall outside the scope of the Ita release and survive. The FLSA and state law Uncompensated Hours Claims otherwise survive.

- California plaintiffs' Illegal Deductions Claims are dismissed in their entirety, both because of plaintiffs' consent (for the period after January 14, 2008) and because of the Ita release (for the earlier period).

## IV.    The Illegal Deductions Claims

The parties have cross-moved for summary judgment on the state law-based Illegal Deductions Clams. Plaintiffs claim that Roto-Rooter provides its customers with a warranty on certain work performed by its technicians, typically six months for residential services and three months for commercial services. If Roto-Rooter needs to provide additional service on work under warranty, it often does not charge the customer for the additional work. Although Roto-Rooter attempts to send the same technician to do the warranty work as did the original work, if that technician is not available, Roto-Rooter typically deducts the commission paid to the technician for the original work and pays it to the technician who performed the warranty work through a process known as a call-back.[12]

Roto-Rooter's systems track call-backs. They can be deducted from either a technician's commissions or their non-commission earnings. The call-back policy is companywide, but does not apply in California or Hawaii. According to Roto-Rooter's February 2008 Company Handbook, call-backs may be made because "all commissions are considered advances until the warranty period runs." The call-back policy, however, predates 2008.

Plaintiffs allege that the call-back practice violates state law prohibitions on deductions from wages, including wages earned on a commission basis, and seek summary judgment on these grounds. Defendants argue that call-backs do not constitute illegal wage deductions because commissions are advances, not earned wages, and, even if the commissions are considered earned wages, call-back deductions are allowed under certain states' laws because the technicians in those states authorized the deductions in writing. Indeed, as this Court has previously held, "[i]f the reversals are found to be part of the calculation of the final wage, then

---

[12] If the same technician who did the original work also performs the warranty work, the technician receives no commission for the warranty work.

no class member has a claim because, by definition, there has been no 'wage deduction.'" See

Class Certification Order, at 25. Thus, as plaintiffs put it, "the first issue to be decided . . . is

whether the call-back process . . . constitutes a wage deduction or is simply the calculation of the

final commission."[13]

The parties rely on competing documents in arguing over whether the call-backs

constitute wage deductions or part of the calculation of final wages. Plaintiffs rely on the

Service Technicians Compensation Agreement ("TCA"), a contract that technicians enter into

with Roto-Rooter when hired.[14] The TCA provides that:

> Roto-Rooter pays service technicians commissions and reimburses for
> substantiated expenses. The commissions are based upon the amounts collected
> or billed (authorized) depending on the type of work done, LESS any sales, excise
> or other taxes; any special job costs such as permits, helpers, and outside labor;
> and any special charges for each job such as insurance surcharges that the
> company may deem necessary and may impose from time to time.

Because, under the TCA, commissions are calculated based on the "amounts collected and billed

less certain items like taxes," these items are known to Roto-Rooter at the end of each week, and

technicians are paid on a weekly basis, plaintiffs argue that commissions are earned weekly.

Further, nothing in the TCA characterizes the commissions as advances or includes call-backs as

part of calculating the commissions.

Defendants first criticize plaintiffs' reliance on the TCA. They argue that nothing in the

TCA establishes when technicians earn their wages. Instead, defendants rely on RRSC's

Reversal of Commission Policy which has been contained in the Roto-Rooter Employee

Handbook since February 2008. The Policy states that "[b]ecause commissions are subject to

---

[13] Plaintiffs have conceded that their Illegal Deduction Claims, as now stated, are not viable under Missouri or Ohio law. Accordingly, the Illegal Deduction Claims under Missouri and Ohio law are dismissed.

[14] Defendants make much of the fact that there is no evidence that 17 of the 39 Discovery Plaintiffs even signed the TCA. But defendants' policies require this form to be completed upon hiring.

adjustments . . . all commissions are considered advances until the invoice is paid and the warranty period expires." Since February 2008, when technicians receive their weekly timesheets, they are required to acknowledge and approve the adjustments to their commissions or raise concerns with their supervisors. Further, technicians, including 28 of the 39 Discovery Plaintiffs, signed acknowledgments stating that they "understand that it is my responsibility to read and comply with the policies contained in the Handbook" and that they have "full access to the Handbook, which is readily available . . . in a public place at my work location."

Standing alone, however, the Reversal of Commission Policy in the Employee Handbook cannot demonstrate as a matter of law that the commissions were advances for several reasons. First, the Policy was only written in February 2008. Technicians hired prior to that date could not have read the Policy until it was included in the Employee Handbook, although RRSC apparently had an ongoing practice concerning call-backs from at least March 2004. Further, technicians are only required to acknowledge that they have access to the Employee Handbook, not that they have read it. And, perhaps most importantly, the Employee Handbook itself contains the explicit disclaimer that "The Handbook is neither a contract of employment nor a legal document."

Nevertheless, defendants argue that it is immaterial whether or not the Employee Handbook is a binding contract because "the core inquiry under the laws of each Class State[] is whether there was an understanding between RRSC and plaintiffs that commission payments were advances." According to this position, even if the Employee Handbook does not itself establish that the commissions are advances, it is evidence of the understanding held by RRSC and the technicians concerning the nature of the commissions. In support, defendants cite a

number of cases from different class states in which non-contractual employment policies are used by courts to determine when a commission is fully earned.

Plaintiffs attempt to foreclose defendants' approach by arguing that any agreement (explicit or implicit) that technicians' commissions are advances would be void as contrary to public policy because that agreement has the effect of driving technicians' compensation below minimum wage. See Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc., 230 F. Supp. 2d 439, 451 (S.D.N.Y. 2002) ("it is well established that contracts that offend the underlying purpose of a statute are unenforceable"). Plaintiffs' interpretation of the law is correct.[15] But plaintiffs have failed to demonstrate, in support of their summary judgment motion, that the call-back policy actually causes minimum wage violations. Defendants have presented evidence that Roto-Rooter has a policy of bumping-up technician earnings when commissions alone are insufficient to meet minimum wage obligations for a particular workweek. As defendants point out, the Department of Labor approved a similar policy in a 1981 opinion letter.[16] Plaintiffs claim that this policy either does not work or is not followed, but plaintiffs have failed to show a single instance where the imposition of a call-back alone brought a technician's wages below the

---

[15] See Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740, 101 S. Ct. 1437, 1444-45 (1981) (rights under the FLSA are "nonwaivable" and "cannot be abridged by contract"); Cao v. Wu Liang Ye Lexington Rest., Inc., No. 08 Civ. 3725, 2010 WL 4159391, at *3 (S.D.N.Y. Sept. 30, 2010) ("Under the FLSA, employers may not require that their employees give any money back to them, such that an employee['s] resulting compensation falls below the minimum wage. The FLSA's requirement that wages be paid 'free and clear' means that any money an employee "'kicks back" directly or indirectly to the employer or another person for the employer's benefit' must be excluded from calculation of the employee's wages."); Rogers v. Sav. First. Mortg. LLC, 362 F. Supp. 2d 624, 631 (D. Md. 2005) ("Thus, in order to meet the requirements of [the FLSA's minimum wage provisions], an employee compensated wholly or in part on a commission basis must be paid an amount not less than the statutory minimum wage for all hours worked in each workweek without regard to his sales productivity.").

[16] Specifically, the employer at issue paid its mechanics on a commission basis and had a policy whereby if, in a given workweek, the mechanic's wages fell below the minimum wage, the employer would provide a subsidy to bring the mechanic's compensation up to the minimum wage level and would then recoup the subsidy from the mechanic's commissions in excess of the minimum wage in future workweeks. The Department of Labor approved of this policy, noting that the employer had "documentation to show that in every week of employment every mechanic has received no less than the Federal minimum wage for all hours worked." See Dep't of Labor Op. Ltr., Fair Labor Standards Act (FLSA) WH 506, 1981 WL 179034 (March 3, 1981).

minimum wage for the week.[17] Consequently, plaintiffs have not persuaded the Court that defendants' interpretation is barred by public policy.

Under the law of all of the class states, the question of when a commission is earned is answered by examining the relevant employment contract.[18] Although the TCA at no point says that technician's commissions are advances, it is also silent on when commissions are earned. The parties quibble over whether the TCA is a "fully integrated agreement" and whether the Employee Handbook's provisions may be "grafted" on to the TCA. But the parties overlook the

---

[17] Plaintiffs point to plaintiff LeVoid Bradley's time records for the week ending May 5, 2009. But assuming, *arguendo*, that these records establish a minimum wage violation, they do so only because of the business expenses that Bradley incurred, not because of call-backs. A call-back was assessed against Bradley for that week and his total wages for the week was $661.47. Bradley worked in Missouri where, at the time, the applicable minimum wage was $7.05. He worked 43 hours and 25 minutes that week which entitled him to $318.15 in wages. Once the $342.29 for expense reimbursements is deducted from Bradley's total pay, the remaining amount, $318.18, is basically equal to the minimum wage he was owed. Obviously, if the other $531.94 in substantiated expenses that had not yet been reimbursed were factored in, Bradley's compensation would have been inadequate. But that violation would stem from the business expense policy, not the call-back policy. This example, therefore, does not suffice to establish that minimum wage violations occurred as a result of the call back policy.

[18] See In re Citigroup, Inc., Capital Accumulation Plan Litig., 652 F.3d 88, 91 (1st Cir. 2011) (construing employment contract documents to determine whether commissions had been earned and, thus, protected under the Colorado Wage Claims Act); McKeithan v. Novant Health, Inc., No. 08CV374, 2008 WL 5083804, at *3 (M.D.N.C. Nov. 25, 2008) (analyzing the employer's compensation policy to determine that the wages plaintiff sought to recover were not 'accrued' wages under the North Carolina Wage and Hour Act); Hull v. Paige Temp., Inc., No. 04 C 5129, 2005 WL 3095527, *17 (N.D. Ill. Nov. 16, 2005) ("A prerequisite to maintaining a claim under the [Illinois Wage Payment and Collection Act] is proof that the employee had a contract or agreement which entitled the employee to compensation."); Graff v. Enodis Corp., No. 02 Civ. 5922, 2003 WL 1702026, at *2 (S.D.N.Y. Mar. 28, 2003) (concluding for the purpose of a New York Labor Law claim, among other claims, that commissions were earned in accordance with the provisions of employer's policy bulletin); Glass v. IDS Fin. Serv., Inc., 778 F. Supp. 1029, 1068-69 (D. Minn. 1991) (examining the relevant compensation agreement to determine whether commissions were earned for purposes of the Minnesota wage deduction statute); Glass v. IDS Fin. Serv., Inc., 778 F. Supp. 1029, 1068-69 (D. Minn. 1991) (examining the relevant compensation agreement to determine whether commissions were earned for purposes of the Minnesota wage deduction statute); Backman v. Nw. Publ'g Ctr., 147 Wash. App. 791, 794-95 (Wash. App. Div. 2008) (relying on the provisions of the employment contract to determine when plaintiff's commissions were earned for the purposes of his claim under the Washington Wage Payment Act); Neal v. E. Controls, Inc., No. A-4304-06T1, 2008 WL 706853, at *4, 7 (N.J. Super. Ct. App. Div. Mar. 18, 2008) (holding that "[t]he trial court properly found that plaintiff's entitlement to post-resignation commissions was determined by his contractual relationship with defendant" and that the New Jersey Wage Payment Law was not "violated because the post-termination commissions were not wages due at the time"); Gress v. Fabcon, Inc., 826 N.E.2d 1, 3-4 (Ind. Ct. App. 2005) (examining the employer's commission program in order to determine whether the commissions were wages under the Indian Wage Payment Statute); Mytych v. May Dep't Stores Co., 793 A.2d 1068, 1074 (Conn. 2002) (commenting that the definition of "wages" under Connecticut law, which includes commissions, "expressly leaves the determination of the wage to the employer-employee agreement, assuming some specific conditions are met" and looking to the "specific commission agreement between the defendant and the plaintiffs" to determine when "wages would accrue or vest"). The California Illegal Deductions Claims were dismissed in Section III.C., *supra*.

plain language of the TCA, which provides that "commissions are based upon the amounts collected or billed (authorized) depending on the type of work done, LESS . . . *any special charges for each job such as insurance surcharges that the company may deem necessary and may impose from time to time.*" (emphasis added). In other words, when they sign the TCA, the technicians expressly authorize Roto-Rooter to take additional deductions from their commissions relating to certain jobs as it deems necessary. Roto-Rooter's call-back policy falls within this broad grant of authority. The Employee Handbook does not need to be "grafted" on to the TCA nor does it need to be a separate contract because the TCA allowed Roto-Rooter to issue policies regarding deductions from commissions. See, e.g., Graff v. Enodis Corp., No. 02 Civ. 5922, 2003 WL 1702026, at *2 (S.D.N.Y. Mar. 28, 2003) (interpreting a policy bulletin provided by the employer as a contract "concerning the method of calculating commissions"). See also Kaplan v. Capital Co. of Am., 298 A.D.2d 110, 111, 747 N.Y.S.2d 504 (1st Dep't 2002) ("Although the handbook asserted that the policies and benefits contained therein were not intended to be contractual and were subject to change at any time, this provision was plainly not intended to render the handbook wholly nugatory.").[19]

Plaintiffs argue that, unlike deductions for call-backs, all the enumerated items in the TCA that can reduce a technician's commissions are known to Roto-Rooter by the end of the given workweek and Roto-Rooter pays the technician at that time. That may very well be the

---

[19] Many plaintiffs testified that they considered their commissions earned when they were paid, not when the warranty period expired. But the technicians' unilateral understanding cannot trump the explicit terms of the agreement that they endorsed. As the oft-cited quote from Learned Hand explains:

A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

Hotchkiss v. Nat'l City Bank of New York, 200 F. 287, 293 (S.D.N.Y. 1911).

case, but the TCA also contains a savings clause which demonstrates that these enumerated deductions are not the only deductions that are permitted. Moreover, Roto-Rooter did not impose the call-back policy on technicians without notice.[20] The parties agree that the policy pre-dated the February 2008 Employee Handbook. Most plaintiffs signed that they "understand it is my responsibility to read and comply with the policies in the Handbook" and that they have 'full access to the Handbook which is readily available . . . in a public place at my work location." Call-back adjustments were disclosed to technicians on a weekly basis throughout the relevant period and, since February 2008, technicians' weekly time listings have contained an authorization by which the technician assents "to the terms of Roto-Rooter's OPCC adjustment system," which encompasses the call-back practice.

Having established that technicians' commissions are advances rather than earned wages, the question remains whether Roto-Rooter's call-back policy violates the applicable state laws. There are nine remaining states for which plaintiffs assert their Illegal Deductions Clams. Under the laws of all nine states, only deductions from earned wages are actionable.[21] Therefore,

---

[20] The Court does not mean to imply that this notice is sufficient to make the call-back policy a modification of the TCA. Rather, the notice is only relevant to show that technicians were, or should have been, aware of the policy.

[21] See McKeithan, 2008 WL 5083804, at *3 (concluding, where defendant's policy precluded certain payments, that "the so-called 'withheld payments' Plaintiff now seeks to recover are not, in fact, accrued wages of the type that fall under the ambit of" the North Carolina Wage and Hour Act); Kelley v. Sun Microsystems, Inc., 520 F. Supp. 2d 388, 406 (D. Conn. 2007) (concluding that, because defendant "was not obligated to make the commission payments to" plaintiff, she "was not owed 'wages' as defined under Connecticut law" and dismissing her claim under the Connecticut wage collection statute); Hull, 2005 WL 3095527, *17 ("A prerequisite to maintaining a claim under the [Illinois Wage Payment and Collection Act] is proof that the employee had a contract or agreement which entitled the employee to compensation."); Glass, 778 F. Supp. at 1068 (explaining that the relevant Minnesota statute is "only applicable to deductions taken from earned wages or commissions"); Backman., 197 P.3d at 1189 (affirming the conclusion that, pursuant to the employment contract, commissions were not "wages due" to the employee under Washington law); Neal, 2008 WL 706853, at *7 (holding that "no statutory mandate" under the New Jersey Wage Payment Act "was violated because the post-termination commissions were not wages due"); Pachter v. Bernard Hodes Grp., Inc., 10 N.Y.3d 609, 618, 861 N.Y.S.2d 246 (2008) (explaining that the New York Labor Law provision that prohibits deductions only applies once a "commission was 'earned' and becomes a 'wage,'" which, in turn, "is regulated by the parties express or implied agreement"); Gress, 826 N.E.2d at 3-4 ("[Plaintiff] can prevail on his claim under the [Indiana] Wage Payment Statute only if the payments he seeks are 'wages'" and "compensation constitutes 'wages' only if it is compensation for time worked and is not linked to a contingency"); Barnes v. Van Schaack Mortg., 787 P.2d 207, 209 (Colo. App. 1990) ("The [Colorado] Wage Claim

plaintiffs' motion for summary judgment on the Illegal Deductions Clams is denied.[22]
Defendants' motion on this issue is granted and the Illegal Deductions Clams are dismissed.

## V.    The Business Expense Claims

Plaintiffs assert that Roto-Rooter technicians are required to bear certain job expenses, specifically: (1) the cost of acquiring a work van; (2) van operation costs, including gas, tolls, registration, parking, and insurance; (3) van maintenance costs; (4) the cost of acquiring tools used for the job; (5) the costs of job equipment, such as cables; and (6) the cost of parts which technicians are required to purchase. Plaintiffs claim that Roto-Rooter imposes strict requirements on the technician's work van, including signage requirements, and forbids use of the van for non-work purposes.

In calculating the commission to pay a technician, Roto-Rooter adds a premium of 15% of the amount the technician collected or billed to cover expenses. According to plaintiffs, Roto-Rooter makes no attempt to ensure that the commissions, plus the premium, cover all of the expenses they actually incur. Further, as a matter of payroll policy, Roto-Rooter allows technicians to divide their weekly commissions into "wages" and "expense reimbursements." Plaintiffs characterize this policy as an "accounting gimmick" done for tax purposes that has no effect on how much technicians are paid.[23] Technicians could not, however, shift commissions to expenses if it made it appear that the technician did not earn minimum wage that week.

Act . . . applies only to compensation that has been earned under the employment agreement.").

[22] Plaintiffs' complaint asserts Illegal Deductions Claims under the laws of several states for which no state law class action was certified. Plaintiffs' motion discusses the law of many of these states (Arkansas, Delaware, Kentucky, Louisiana, Maryland, Nevada, Pennsylvania, South Carolina, and West Virginia), but not all of them. It is not clear if plaintiff sought to move for summary judgment on these state law claims. The Court has not ruled on these claims but notes that its holding concerning the nature of the technicians' commissions appears to be equally relevant to the non-class states as it is to the states with certified classes.

[23] Plaintiffs stress that technicians are not required to report all of their expenses to Roto-Rooter and that, for some branches, reporting expenses was the exception rather than the rule.

Therefore, plaintiffs claim that, if a technician's expenses for a given week equaled his total commission earnings, he could not designate all of his commissions as expense reimbursement. Although the technician only broke even for that week, he had to leave enough commissions in the "wage" category to suggest that he earned minimum wage. If expenses could not be shifted because of this rule, they would be carried over to a later pay period.

Plaintiffs cite the example of one technician, LeVoid Bradley. For one week in April 2009, Bradley incurred $1,098.35 in work expenses, but he was only paid $516.20. According to plaintiffs, Bradley should have been paid $1,361.02, which would have encompassed his expenses and an additional $267.67 to raise his earnings to the minimum wage level. Instead, Bradley's expenses were deferred, according to plaintiffs, in order to conceal that "[i]n effect, Bradley paid $582.15 to work for Roto-Rooter that week." Plaintiffs claim that the class representative plaintiffs received less than the minimum wage for approximately 5% of the weeks that they worked.[24]

On the basis of this conduct, plaintiffs seek summary judgment "that Roto-Rooter's policy of shifting its business expenses, including the cost of the van itself, onto Plaintiffs is a violation of the FLSA and state minimum wage laws where the expenses have the effect of bringing the earnings below the established minimum wage." In essence, plaintiffs seek summary judgment that Roto-Rooter's business expense policy is unlawful. Additionally, plaintiffs claim that defendants failed to comply with their obligation to "maintain and preserve payroll or other records containing" information on "[t]otal . . . deductions from wages paid each pay period." 29 C.F.R. § 516.2(a)(10). Defendants, on the other hand, argue that the Business Expense Claims classes should be decertified because no minimum wage violations were

---

[24] In responding to defendants' interrogatories, plaintiffs created a spreadsheet ("Exhibit D") which, they represent, constitutes "a list of the weeks that Plaintiffs incurred business-related expenses that caused minimum wage violations."

reported for certain discovery plaintiffs and because there are individualized inquiries.

Defendants oppose plaintiffs' summary judgment motion by attempting to raise a number of

purported fact issues concerning whether certain expenses can properly be considered business

expenses and how those expenses are incurred.

The parties generally do not dispute the applicable law. A "minimum wage must be paid

free and clear of any deductions or kickbacks to the employer[.]" Teoba v. Trugreen Landcare

LLC, 769 F. Supp. 2d 175, 180 (W.D.N.Y. 2011). According to regulations adopted under the

FLSA:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid
> by the employer and received by the employee unless they are paid finally and
> unconditionally or "free and clear." The wage requirements of the Act will not be
> met where the employee "kicks-back" directly or indirectly to the employer or to
> another person for the employer's benefit the whole or part of the wage delivered
> to the employee. This is true whether the "kick-back" is made in cash or in other
> than cash. For example, if it is a requirement of the employer that the employee
> must provide tools of the trade which will be used in or are specifically required
> for the performance of the employer's particular work, there would be a violation
> of the Act in any workweek when the cost of such tools purchased by the
> employee cuts into the minimum or overtime wages required to be paid him under
> the Act.

29 C.F.R. § 531.35. See also Arriaga v. Florida Pac. Farms, 305 F.3d 1228, 1236 (11th Cir.

2002) ("there is no legal difference between deducting a cost directly from the worker's wages

and shifting a cost, which they could not deduct, for the employee to bear."). Since the purpose

of the minimum wage laws is to provide workers with a minimum standard of living, see

generally 29 U.S.C. § 202, employer-provided food and lodging may be deducted from wages,

but items for "primarily for the benefit or convenience of the employer," like tools of the trade,

may not be deducted. Compare 29 C.F.R. § 531.3(d) with § 531.29.

A. Plaintiffs' Summary Judgment Motion

According to plaintiffs, "the only question on summary judgment is which of the many expenses that Roto-Rooter requires its Technicians to bear are properly considered to be "primarily for the benefit or convenience of the employer." Defendants, however, raise a number of challenges which the Court addresses in turn.

First, defendants contend that Roto-Rooter need not reimburse plaintiffs for all their van-related expenses, but only those incurred on Roto-Rooter's behalf. Defendants highlight the testimony of certain plaintiffs, including LeVoid Bradley, that they used their vans for personal reasons while employed by Roto-Rooter and argue that expenses related to personal use, including gas, tolls, depreciation, and maintenance should not be considered in determining the proper minimum wage payment. Further, defendants point out that, under the law, they are not responsible for technicians' commuting expenses, see 29 C.F.R. § 531.32(a), and maintain that these expenses must be accounted for separately.

These incidental personal uses, however, pale in comparison to the abundant evidence that suggests that technicians' van-related costs were primarily for the benefit of Roto-Rooter. Technicians are required to purchase a particular kind of van and equip it a certain way. The vans must carry Roto-Rooter signage and Roto-Rooter receives about 10% of its business from customers who saw a Roto-Rooter van. Technicians are not permitted to use the van for personal reasons and the smell of the plumbing equipment kept in the van makes other uses impractical. These facts suggest that the technicians' vans are "tools of the trade." See Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 511 (S.D.N.Y. 2010) ("Vehicles . . . are considered 'tools of the trade' if employees are required to possess and utilize them in the course of their employment.")

More importantly, the fact that the technicians made incidental personal use of the vans does not imply that van-related expenses were not *primarily* for Roto-Rooter's benefit. See Marshall v. Sam Dell's Dodge Corp., 451 F. Supp. 294, 304 (N.D.N.Y. 1978) (concluding that "demonstration cars" were "furnished primarily for the benefit of" the employer, despite the fact that employees could drive the cars for personal reasons); Brennan v. Modern Chevrolet Co., 363 F. Supp. 327, 333 (N.D. Tex. 1973) (finding that demonstration cars were "furnished [to] these salesmen primarily for the benefit of the defendant-employer" even though approximately 90% of the miles driven were for the salesmen's personal use). Further, Roto-Rooter did not pro-rate their reimbursement of van-related expenses for personal use when reporting these expenses to the IRS. See id. (considering the tax treatment of a furnished automobile in determining that it was primarily furnished for the employer's benefit). Thus, as "tools of the trade," technicians' van-related expenses may not reduce their wages below the minimum wage. See Lin, 755 F. Supp. 2d at 511-12 ("employers can require employees to bear the costs of acquiring and maintaining tools of the trade so long as those costs, when deducted from the employees' weekly wages, do not reduce their wage to below the required minimum.").

Further, Roto-Rooter recognizes a category of expenses, known as "substantiated expenses," which are business-related expenses for which Roto-Rooter provides tax deductions to its technicians. According to Roto-Rooter policy, tools, supplies, tolls, gasoline, van repair and maintenance, the outside purchase or lease of a van, and the outside purchase of van insurance, among other items, are considered "substantiated expenses" when supported by detailed expense receipts. This policy establishes, fairly conclusively, that at least "substantiated expenses" constitute business expenses that may not cut into the minimum wage.

Second, defendants argue that Roto-Rooter does not need to reimburse a technician for his business expenses in a single week because the technician does not necessarily incur the entire cost of the expense in a single week. Although certain expenses like parking and tolls may be properly accounted for during the week in which they are incurred, defendants argue that larger expenses, such as financing the purchase of a van, are incurred over a period of time. For example, according to defendants, a technician's monthly van finance or lease payments are "not incurred in the week payment is made[,]" instead the expense "is reasonably spread across a one-month period, and RRSC accounts for such expenses in this manner." Defendants also suggest that the cost of an expensive replacement van part, like a fuel pump, may be amortized over the life of that part.

But, as plaintiffs correctly point out, defendants have not presented any authority to show that their accounting theory is consistent with the FLSA (or the law of any relevant state), nor is the Court aware of any. To the contrary, the FLSA consistently ties the minimum wage inquiry to an individual work week. See, e.g., 29 C.F.R. § 531.35 (providing that there would be a violation of the FLSA "in any workweek when the cost of such tools purchased by the employee cuts into the minimum . . . wages required to be paid him under the [FLSA]"). And the policy behind the minimum wage laws – the maintenance of a minimum standard of living for workers – would be vitiated if the period for expense reimbursement were tied to the period during which the employer receives the benefit of the expense, rather than the period in which the employee incurs the expense.[25]

---

[25] This is not to suggest that, when a technician purchases a van with financing, Roto-Rooter needs to reimburse the technician for the full purchase price of the van in one week. Nothing in the minimum wage laws requires such a windfall for employees. Rather, an employer is required to reimburse an employee's expenses as the employee incurs them.

But defendants' final argument is their most compelling. Defendants argue that the law does not require them to reimburse technicians for their actual expenses. Instead, they only need to provide a reasonable approximation of employee expenses in order to comply with the minimum wage laws. Defendants rely on cases addressing the reimbursement of pizza delivery drivers for their transportation expenses. In Wass v. NPC Int'l Inc., 688 F. Supp. 2d 1282, 1285-86 (D. Kan. 2010), the court reasoned that § 531.35, which prohibits employers from making employees bear business expenses that cut into the minimum wage, indirectly incorporates language from 29 C.F.R. § 778.217, which governs the calculation of an employee's regular rate for overtime purposes. Under § 778.217(b), the "actual or reasonably approximate amount" of a variety of employee business expenses "will not be regarded as part of the employee's regular rate" for overtime purposes. The Wass court concluded that this language, read in conjunction with § 531.35 meant that "the applicable regulations . . . permit an employer to approximate reasonably the amount of an employee's vehicle expenses without affecting the amount of the employee's wages for purposes of the federal minimum wage law." 688 F. Supp. 2d at 1286. See also Darrow v. WKRP Mgmt., LLC, No. 09-cv-1613, 2011 WL 2174496, at *5 (D. Colo. June 3, 2011) ("Defendants correctly argue that they did not have to reimburse Plaintiff for his actual expenses, but could approximate Plaintiff's vehicle related expenses in setting his reimbursement rate.")

Plaintiffs challenge defendants' reliance on these cases, arguing that § 778.217 only addresses overtime compensation and, thus, the cases are inapposite. Since overtime regulations address different policy concerns than minimum wage regulations, there is some force to plaintiffs' argument, but, as defendants correctly observe, the Wass line of cases does address an employer's obligation to pay the minimum wage. And defendants have put forward evidence

that, even though Roto-Rooter reimburses a technician for his "substantiated expenses," it also incorporates a premium of 15% into a technician's commissions and that this premium is intended to cover technicians' work-related expenses, including their van costs. Thus, defendants have created a fact issue as to whether they have satisfied their minimum wage obligations by reasonably approximating a technician's expenses. Whether the 15% premium represents a reasonable approximation of expenses, especially when viewed in light of Roto-Rooter's substantiated expenses policy, is an issue for the jury to determine. Accordingly, plaintiffs' motion for summary judgment on the Business Expense Claims is denied.

Two other holdings flow from this ruling. First, plaintiffs have asked the Court to grant them summary judgment and hold that Roto-Rooter violated its record-keeping obligations under the FLSA by failing to keep records of all employees' business-related expenses.[26] Defendants admit that Roto-Rooter did not keep records of all employee-related expenses but argue that it had no obligation to do so, especially since not all technicians submitted all of their expense receipts. The Court agrees with defendants. The authority cited by plaintiffs establishes that the obligation to keep employee records extends to keeping records of deductions from wages, not keeping records of employee expenses. See 29 C.F.R. § 516.2(a)(10) (addressing "[t]otal additions to or deductions from wages"). Although "there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear[,]" Arriaga, 305 F.3d at 1236, it would not make sense for the FLSA to impose on an employer the obligation to keep a record when control over that record is exercised by the employee, rather than the employer.

---

[26] Plaintiffs sought summary judgment on this issue in order to shift the burden of proof for establishing damages on to defendants. See generally Chao v. Vidtape, Inc., 196 F. Supp. 2d 281, 293 (E.D.N.Y. 2002).

Second, plaintiffs ask the Court to grant summary judgment on their entitlement to FLSA liquidated damages on their FLSA Business Expense Claim. If the Court had found as a matter of law that defendants were liable for the FLSA Business Expense Claim, summary judgment on liquidated damages might be appropriate. But liability has not yet been determined, which is, of course, a prerequisite for any award of liquidated damages. See Wong v. HSBC Mortg. Corp., 749 F. Supp. 2d 1009, 1020-21 (N.D. Cal. 2010) (finding "the question of entitlement of an award of liquidated damages [to be] premature" where plaintiffs had not carried their summary judgment burden). Accordingly, the Court denies plaintiffs' motion for summary judgment on the FLSA liquidated damages issue as premature.

B. Defendants' Motion to Decertify

Defendants ask the Court to decertify the Business Expense Claims classes and FLSA collective action. Defendants argue that, even if all of plaintiffs' expenses were for Roto-Rooter's benefit and incurred during the weeks contended, plaintiffs have failed to show on a class-wide basis that these expenses caused plaintiffs' earnings to fall below the minimum wage. According to defendants, plaintiffs have only demonstrated a violation for one technician (Bradley), in one week of employment, and have no proof that such violations were widespread, other than Exhibit D to their own interrogatory responses which is not admissible evidence. See generally Gilmore v. Macy's Retail Holdings, Civ. No. 06-3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009) ("a litigant may not introduce statements from its own answers to interrogatories . . . as evidence because such answers typically constitute hearsay when used in this manner.").[27] Additionally, defendants contend that Exhibit D fails to show any minimum wage violations for a number of Discovery Plaintiffs and that Exhibit D shows a high degree of disparity in terms of

---

[27] Defendants further criticize Exhibit D for lacking any documentation or explanation to support including the supposed instances of minimum wage violations it identifies.

the number of minimum wage violations even within state classes. Accordingly, defendants argue that plaintiffs' cannot prove their claims on a class-wide basis and the technicians are not similarly situated for FLSA purposes.

Further, defendants assert many of the same arguments that they made in opposition to plaintiffs' summary judgment motion to demonstrate that individual issues will predominate with regard to the Business Expense Claims. Specifically, they contend that determining whether certain expenses will be considered business expenses and when those expenses must be reimbursed requires an individualized inquiry. Consequently, determining whether the 15% premium for expenses is a reasonable approximation of expenses is also, according to defendants, an individualized inquiry.

Defendants have not persuaded the Court. Roto-Rooter's "substantiated expenses" policy makes the question of what constitutes a business expense a question that can be readily answered through generalized proof. Moreover, as discussed above, defendants have cited no authority to convince the Court that it should be allowed to account for employee expenses other than according to when the employee incurs the expenses, so as to create an individualized issue. Lastly, assessing the reasonableness of the 15% premium can be done by comparing the premium amount to the "substantiated expenses." This analysis can be performed entirely through using Roto-Rooter's records and, thus, the issue is susceptible to generalized proof.

With regard to the fact that plaintiffs cannot show violations for certain technicians, defendants misconstrue the nature of the Business Expense Claims. The Court agrees with plaintiffs that "[i]mplicit in" the Court's certification of the Business Expense Claims "is the recognition that some individuals' expenses will show a violation and others will not." The lack of claims for certain technicians and the disparity between technicians in no way makes the

claims of the classes and the collective action less susceptible to generalized proof. Accordingly, defendants' motion to decertify the Business Expense Claims classes and FLSA collective action is denied.

**VI.    The Uncompensated Hours Claims**

Since the Court's Class Certification Order, plaintiffs' Uncompensated Hours Claims have been limited. Currently, the Uncompensated Hours Claims are based on two sets of factual allegations: (1) that Roto-Rooter shaved hours from plaintiffs' actual working time and (2) that Roto-Rooter did not compensate plaintiffs for time spent at "turn-in."

Generally, technicians are compensated solely through their commissions for hours worked up to 40 per week. Technicians receive an overtime premium for hours worked in excess of 40 per week. The gravamen of both the time-shaving and the "turn-in" claims is that by deducting or failing to record working time, Roto-Rooter lowered technicians' hours in order to avoid paying them overtime premiums.

A.    Amendment of the Class Definitions for the Uncompensated Hours Claims

Before turning to defendants' motion concerning the Uncompensated Hours Claims, plaintiffs have sought an amendment of the class definitions relating to these claims. Although the Court initially certified the Uncompensated Hours Claims classes to include time spent maintaining vans and work equipment, the Court later granted defendants' motion for reconsideration and decertified the classes for this portion of the Uncompensated Hours Claims. See Memorandum Decision & Order, dated July 8, 2011 (the "Reconsideration Order"). Plaintiffs have now asked the Court to amend the class definitions yet again and to include in the Uncompensated Hours Claims time for van maintenance that "as a practical matter, cannot always be performed on the clock."

Plaintiffs claim that they were not compensated for time they spent maintaining their vans and tools. According to a Roto-Rooter witness, technicians were required to maintain their equipment and vans but, if they performed this work outside of a branch office, there was no clear way for them to record time. After the Court certified classes on this portion of the Uncompensated Hours Claims, defendants sought reconsideration. They argued that the Court certified the Uncompensated Hours Claims classes based on plaintiffs' representation that they would be able to demonstrate liability almost entirely through the use of defendants' records, but since no document would be able to establish liability for van and tool maintenance time, plaintiffs would have to rely on "testimony from a parade of Technicians claiming that they actually performed van and equipment maintenance off-the-clock."

In addressing defendants' reconsideration motion, the Court disagreed with defendants. It cited testimony from a Roto-Rooter witness that, with regard to vans, only minor maintenance could be done during compensable "stand-by" time. The Court reasoned that since technicians were required to complete tasks that, as a practical matter, could not always be performed in the office and were not otherwise compensated, representative testimony could be sufficient to demonstrate liability. See Reconsideration Order, at 2-3. But the witness also explained that tool maintenance time could be registered as compensable "stand-by" time by someone at the branch office, even if done outside the office, and that some technicians were able to record van and tool maintenance time as "stand-by" time, although the time was not always compensated. Id. at 3-4. In light of this evidence "suggesting that some of the technicians may have been able to squeeze all of their maintenance time on stand-by time," the Court concluded that individualized testimony would be necessary to establish liability on this claim and liability could not be established on a class-wide basis through representative testimony. Id. at 4.

Accordingly, the Court amended the definition of the Uncompensated Hours Claims classes to exclude claims for uncompensated time spent maintaining vans and equipment.

The gravamen of plaintiffs' current argument in support of their motion to amend is that the van and equipment maintenance claims need to be sliced more finely. Plaintiffs argue that the testimony only established that *tool* maintenance was or could have been completed during "stand-by" time. On the other hand, because *van* maintenance, "as a practical matter, cannot always be performed on the clock and was not compensated otherwise[,]" it is an ideal candidate for proof of liability through representative testimony, as the Court suggested in the Reconsideration Order. Plaintiffs further distinguish between minor van maintenance – like oil changes and tidying the van – which could be completed during "stand-by" time, and more major forms of van maintenance which were required but could not be performed while on-the-clock because the technicians had to be able to respond to customer calls quickly.

Although styled as a motion to amend the class definitions, plaintiffs' motion clearly seeks reconsideration of the Reconsideration Order. But plaintiffs fail to demonstrate adequate grounds for reconsideration.[28] The standard for granting a motion for reconsideration is "strict" and "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). See also Polsby v. St. Martin's Press, No. 97 Civ. 690, 2000 WL

---

[28] The Court notes that plaintiffs' motion was brought well after the two-week window for reconsideration motions under Local Civil Rule 6.3 had expired. Plaintiffs offer no explanation for waiting to move for reconsideration until after the parties submitted lengthy summary judgment briefs. Plaintiffs' suggestion that they only learned of the relevant facts once discovery was complete and after the period to move to reconsideration had expired is unavailing. Although more recent testimony may have amplified the record on the issue, there was sufficient testimony on the record prior to the Reconsideration Order for plaintiffs to have argued that major van maintenance was performed off-the-clock.

98057, at *1 (S.D.N.Y. Jan. 18, 2000) ("On [a reconsideration] motion, a party may not 'advance new facts, issues or arguments not previously presented to the Court.'").

Despite their arguments, plaintiffs have failed to show that the Court overlooked anything in the Reconsideration Order. The testimony on which the Court relied in the Reconsideration Order was not confined to tool maintenance; it also encompassed van maintenance. Specifically, the Court quoted testimony that technicians cleaned their vans and changed the oil while on "stand-by" time. See Reconsideration Order at 3 n.2. Moreover, in their briefing on the Reconsideration Order, plaintiffs treated their van and tool maintenance time claim as a single claim. Although plaintiffs acknowledged in their briefing on the Reconsideration Order that there are factual differences between major and minor van maintenance in terms of whether the work was or could be done on-the-clock, plaintiffs nonetheless treated both kinds of maintenance as part of the single claim for van and equipment maintenance. Instead of highlighting a consideration the Court overlooked, it instead appears that plaintiffs have merely thought of a better way to conceptualize and argue their claim. That is not a sufficient basis for reconsideration, especially given this late stage of the litigation and the substantial efforts the parties put into their summary judgment motions.

If the Court were to revisit the issue on its merits, the Court would still deny certification of plaintiffs' claim for major van maintenance that "as a practical matter, cannot always be performed on the clock." Even if certain kinds of maintenance could not practically be completed during "stand-by" time, plaintiffs have not demonstrated how they would differentiate between the kinds of maintenance work that could be done on "stand-by" time and the kinds of work that could not and whether that distinction would be consistent across the class. Perhaps technicians at certain branches could perform more kinds of major maintenance during "stand-

Page 39 of 57

by" time than circumstances at other branches allowed. Indeed, one technician, Shilo Cain, testified that he could perform van maintenance work during "stand-by" time so long as it was not "too involved" and the maintenance would not "take too long" in light of the amount of time he had before his next job.

Thus, it appears that any distinction between minor and major van maintenance that could be drawn is context-dependent and, consequently, proof that defendants should be liable for a particular kind of maintenance work cannot be efficiently adduced through representative testimony. See Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010) ("[T]he [Rule 23(b)(3) predominance] requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"). See also Johnson v. TGF Precision Haircutters, Inc., No. Civ. A. H-03-3641, 2005 WL 1994286, at *4 (S.D. Tex. Aug. 17, 2005) (granting a motion for FLSA collective action decertification where, although "some Plaintiffs may have prima facie claims for FLSA violations at different times, in different places, in different ways, and to differing degrees, . . . the alleged violations are not uniform; to the contrary, they are highly variable"). Accordingly, plaintiffs' motion to amend the class definition is denied.

Before moving on, some housekeeping is in order. Plaintiffs' proposed amendment only related to the state classes for the Uncompensated Hours Claims, not the FLSA collective action on these claims. But, as defendants note, the FLSA collective action on the Uncompensated Hours Claims still technically includes claims based on uncompensated van and equipment maintenance time. Defendants argue that all the reasons that led the court to decertify those claims in the context of the classes apply with equal, if not greater, force to the FLSA collective

action and the Court should decertify the van and equipment maintenance time claim in the FLSA collective action. Plaintiffs' arguments in opposition are the same arguments they make in support of their motion to amend the class definitions. But, for the reasons discussed, those arguments fail. Accordingly, the Court grants defendants' motion and decertifies the van and equipment maintenance time claim in the FLSA collective action.

## B. The Uncompensated Hours Claims Based on Time-Shaving

One of the two remaining categories of plaintiffs' Uncompensated Hours Claims is for time-shaving. Plaintiffs allege that Roto-Rooter routinely altered technicians' time records to reduce their hours and the resulting overtime premium that must be paid. Plaintiffs point to prior accusations and findings of time-shaving at several Roto-Rooter branches.

"Off-the-clock" cases can present challenges for class-wide determination that often preclude certification. See, e.g., Doyel v. McDonald's Corp., No. 08-cv-1198, 2010 WL 3199685, at *6-7 (E.D. Mo. Aug. 12, 2010). In this case, at the class certification stage, the Court expressed concern that because a technician's hours may be altered for an entirely proper reason, such as a technician forgetting to log out at the end of his shift, Roto-Rooter would only be able to defend itself through an individual inquiry into each instance of purported time-shaving. See Class Certification Order, at 20. Nevertheless, the Court certified classes on the time-shaving claims in reliance on plaintiffs' representation that their claims focus on alterations where Roto-Rooter's highly detailed records "themselves demonstrate that it is more likely than not that no legitimate reason for the alteration exists." If, for example, Roto-Rooter's revealed that a technician was only credited for a few minutes of work time for a job that normally took two hours to complete, this would constitute a "temporal impossibility" and demonstrate time-shaving. Id. at 21.

In accepting plaintiffs' proposed means of proving their claims, the Court commented,

> I may have otherwise been skeptical of plaintiffs' ambitious claim that there would be sufficient instances of "temporal impossibilities" for the jury to conclude that defendants impermissibly altered time-records on a class-wide basis, but there is evidence suggesting that plaintiffs' plan is not only plausible but sufficiently sound that defendants have themselves employed it to investigate fraud.

Specifically, Gary Sander, Roto-Rooter's Executive Vice-President, conducted a review of Roto-Rooter's electronic time records using a query he developed to locate "temporal impossibilities" and concluded that one Roto-Rooter branch was engaged in fraud. Id. at 21-22. The Court cautioned, though, that:

> [p]laintiffs have proffered what essentially amounts to a "paper case." I recognize that some testimony will be necessary, not just to authenticate and interpret defendants' records, but to fill in occasional gaps and provide relevant background. However, if plaintiffs begin to have second thoughts about their chances at trial without offering more testimony, I will de-certify the class.

Id. at 38.

Defendants now argue that the Court's skepticism at the class certification stage was warranted and that plaintiffs' time-shaving claims should be decertified because they cannot be proved on a nationwide or statewide basis or, alternatively, that the claims should be dismissed for plaintiffs in some state classes due to a lack of evidence to support their claims. Defendants served contention interrogatories on plaintiffs, asking them to identify every time record that, plaintiffs contend, reflects a "temporal impossibility" that demonstrates time-shaving. In response, plaintiffs produced a spreadsheet attached to their interrogatory answers ("Exhibit A"). Plaintiffs also produced a separate spreadsheet listing instances of purported time-shaving that do not involve "temporal impossibilities" ("Exhibit A2"). Together Exhibits A and A2 contain all the entries on which plaintiffs will rely to prove their time-shaving claims.

First, defendants assert that plaintiffs should not be able to use Exhibit A2 because it was based on queries other than the one developed by Sander to identify "temporal impossibilities." Defendants read the Court's class certification too narrowly. The Court did not merely approve of the specific query Sander employed, but of the kind of query Sander used, namely one that could, using nothing other than defendants' own records and representative testimony, identify time entries that are likely to be the result of improper time-shaving. Plaintiffs purport to have done just that in crafting the queries on which Exhibit A2 is based.

Second, defendants make much of the fact that Exhibit A reveals no "temporal impossibilities" for roughly a quarter of the Discovery Plaintiffs and no "temporal impossibilities" within the FLSA limitations period for nearly 30 percent of the Discovery Plaintiffs. Further, Exhibit A2 reveals no more than one alleged instance of time-shaving for approximately a quarter of the Discovery Plaintiffs. Defendants also highlight many of the distinctions among the Discovery Plaintiffs. For example, defendants point out that some Discovery Plaintiffs in the same state, and even in the same branch, had "temporal impossibilities" while others did not, and that the number of "temporal impossibilities" for plaintiffs in the same state ranged widely, from zero to 22. Similar variations characterize the entries on Exhibit A2.

Plaintiffs are correct, however, that defendants' emphasis on these variations misconstrues the nature of the time-shaving claim. As plaintiffs argue, "[i]mplicit in the fact that individualized proof of off-the-clock time would be necessary is the recognition that not all members of the class would necessarily be able to show such incidents occurred to them" or occurred with the same frequency. In other words, the Court certified the time-shaving claim based upon its belief that plaintiffs could present a "paper case," and establish liability through

the use of records and representative testimony. The fact that some Discovery Plaintiffs were not affected by the purported time-shaving practice or were affected to different extents does not undermine plaintiffs' ability to establish liability – *i.e.* to prove that Roto-Rooter altered employee time records for illegitimate reasons – through generalized proof. See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (stating that, under Rule 23(a)(2), a "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

The cases on which defendants rely to argue otherwise only reinforce plaintiffs' argument. First, in Hughes v. WinCo Foods, No. ED CV11-00644, 2012 WL 34483, at *6 (C.D. Cal. Jan. 4, 2012), the court ruled that the commonality requirement was not satisfied in light of "evidence showing autonomy of [] decision-making from store to store and department to department," which meant that there was "simply no manner in which the timing of [meal and rest] breaks can be proven readily with evidence of 'a single stroke.'" Likewise, collective proof was impossible in Oakley v. Verizon Commc'ns Inc., No. 09 Civ. 9175, 2012 WL 335657, at *14 (S.D.N.Y. Feb. 1, 2012), because there was no single policy at issue; instead the proposed class encompassed employees affected by nine different policies. Plaintiffs in Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456, 467 (S.D.N.Y. 2011), could not rely on a uniform policy or on employer records to prove liability for their alleged off-the-clock work because there were individualized questions as to whether a given supervisor recorded an employee's off-the-clock work on the timekeeping system. In other words, unlike here, the Zivali plaintiffs had no records at all of their uncompensated off-the-clock work. Lastly, in Lugo v. Farmers Pride Inc., 737 F. Supp. 2d 291 (E.D. Pa. 2010), there were no available methods, such as payroll records or any

class-wide evidence concerning the purported practice of non-compliance with compensation policies, that could have avoided individualized determinations of liability. In sum, the key is whether liability issues are susceptible to common proof. Differences between plaintiffs may often interfere with common proof but where, as here, documentary evidence allows for class-wide determinations of these issues, certification remains appropriate.

More troubling, though, is how plaintiffs intend to use Exhibits A and A2 to prove liability for the 1,440 alleged instances of time-shaving that they identify and whether, in light of a number of innocent explanations proffered by defendants, they may still do so on a class-wide basis. Plaintiffs' briefing on this motion reveals that Exhibits A and A2 were generated by applying six electronic queries to analyze Roto-Rooter's time records for the Discovery Plaintiffs. Specifically, plaintiffs' counsel employed the following queries:

- Query 1 identifies instances when a technician performed a job resulting in over $100 in revenue but the job took less than 10 minutes. According to testimony from Sander, such occurrences could indicate time-shaving. Query 1 is limited to instances when the time entry for the job was manually changed during a "turn-in" day (Tuesday or Wednesday) subsequent to the job and the technician's compensable time for the day was reduced.

- Query 2 is a variation on Query 1 designed to account for the theory that shaving could occur by substituting non-compensable personal time ("PR") for work time. Query 2 identifies instances when a technician performed a job resulting in over $100 in revenue that took less than 10 minutes and the job occurred on the same day an entry for at least 60 minutes of PR time was made as the last entry of the day. Sander had testified that situations such as this would require additional investigation to determine if time manipulation had occurred.

- Query 3 is another variation on Queries 1 and 2. Query 3 identifies instances when a technician performed a job resulting in over $100 in revenue that took less than 10 minutes on days when at least 60 minutes of PR time appears in the middle of the day, the PR time record was added during a subsequent "turn-in" day, and the records showed a reduction of compensable time.

- Query 4 applies Sander's original query. It identifies instances when a technician's records were changed to show a job being performed before it had been called into Roto-Rooter's dispatch, and the change resulted in a shortening

of compensable time.

- Query 5 identifies instances where a technician's morning "stand-by" time was changed. An earlier Roto-Rooter investigation of practices in its Atlanta branch revealed that hours were sometimes manipulated by cutting "stand-by" time. Specifically, Query 5 focuses on instances in which a technician began his day on "stand-by" at his scheduled time and the record was changed later in the week (on a Monday, Tuesday, or Wednesday) to show a later start time.

- Query 6 is a variation on Query 5 and identifies instances where a technician ended his day on "stand-by" at his scheduled ending time and the record was changed later in the week (on a Monday, Tuesday, or Wednesday) to show an earlier ending time.

Exhibit A lists the instances identified by Queries 1-4 while Exhibit A2 lists the Queries identified by Queries 5-6. Based on plaintiffs' explanation, these queries appear to be entirely sensible ways to identify instances of time-shaving. Plaintiffs expect the jury to decide whether it is more likely than not that the records identified by each of the six queries represent improper time-shaving. Plaintiffs also plan to support their case with evidence of Roto-Rooter's history of shaving technicians' time records and corporate management's failure to stop it.

But the Court has doubts about how plaintiffs intend to present this evidence to the jury and whether it can be done efficiently. As discussed above, a party may not rely upon its own answers to interrogatories as affirmative evidence. See Gilmore, 2009 WL 140518, at *9. Notably, at this juncture, plaintiffs are not relying on expert testimony or analysis and have not explained how they will show, on a generalized basis, that the conduct identified by the Queries is indicative of time-shaving. Although plaintiffs suggest that they will prove their case through Sander's testimony, it appears that Sander would not be a competent witness. With the exception of Query 4, Sander has no independent knowledge concerning the queries that plaintiffs' counsel employed. And, with regard to Query 4, Sander applied that Query to limited records from the Roto-Rooter branch in Hartford, Connecticut.

Moreover, Sander's declaration in support of defendants' motion for decertification reveals that there are many context-specific innocent explanations for the instances that plaintiffs identified through their queries. The parties do not dispute that the mere deletion of a time entry does not necessarily suggest time-shaving. Roto-Rooter's system automatically deletes entries as part of its proper record-keeping function and many manual deletions and alterations can occur for innocuous reasons. For example, a technician may forget to code out until after he stopped working or, if the job site is out of range of Roto-Rooter's wireless network, the technician cannot properly enter his time until he is back within the network's range.

With regard to Exhibit A, Sander notes that some entries have associated ticket numbers which would allow Roto-Rooter to determine when the job was called in and, thus, whether the instance represents a "temporal impossibility," but other entries do not. Sander claims that many entries on Exhibit A are "facially deficient" in that the deleted time would not have brought the technician's hours above 40 per week, entitling the technician to overtime, or were nonetheless counted in the technician's total hours because it was non-PR time in the middle of the workday. While these criticisms only suggest that Exhibit A is over-inclusive, Sander also examined a sample of entries that were not "facially deficient." For example, although crediting only a minute or two of work time for a job that resulted in revenue might appear to suggest time-shaving, Sander identified eight instances in the sample of entries he reviewed in which the job was actually performed on a different date, as confirmed by the ticket appearing on the record for the correct date. Sander also found cases where a job was originally assigned to one technician but then reassigned to another technician who actually performed the work. Further, time records might show job tickets assigned to a technician even though an examination of Schedule File entries would reveal that the technician's van was out of service on that particular date.

With regard to Exhibit A2, Sander identified a number of instances in which a time entry was modified during the day or two after the work in question, which, according to Sander, is exactly when modifications to account for time entry errors would be made. Further, Sander pointed to other entries in Exhibit A2 which could be explained by the technician leaving early for the day. Defendants also note that for a number of entries on Exhibits A and A2, the technician certified that his weekly time reports were accurate.

Plaintiffs have some persuasive responses to Sander's points. For example, although deducted time from the middle of the workday might not reduce the amount of a technician's compensable time for the day, it would if the time were converted to non-compensable PR time – the exact kind of situation targeted by Query 3. But the thrust of plaintiffs' response to defendants' and Sander's arguments is that they can, and should be allowed to, adjust their queries so as to exclude the innocent explanations identified by Sander and submit revised interrogatory responses.

The law is clear that "[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation" because such an order is "inherently tentative." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982). See also Barone v. Safeway Steel Prods., Inc., No. CV-03-4258, 2005 WL 2009882, at *2 (E.D.N.Y. Aug. 23, 2005) ("District judges are 'required to reassess their class rulings as the case develops,' and if the Court later determines that the requirements of Rule 23 are not met, it may decertify the class.").

Here, as defendants have demonstrated, a number of legitimate reasons for altering time records exist. Although the technicians' certification of the accuracy of their time records of course does not waive their rights to be paid properly, see Brooklyn Sav. Bank v. O'Neil, 324

U.S. 697, 707, 65 S. Ct. 895, 902 (1945), where the time record may have been altered because of an error in the original entry, the certification presents a highly individualized question of fact for each plaintiff and, possibly, for each time entry. Although it appears that many of the other purported innocent explanations may be proffered through using Roto-Rooter's own records, that is not at all clear and the Court can readily see individualized, non-record based questions of fact arising with regard to issues such as whether a technician left early for a day and whether a job was actually reassigned to another technician. Plaintiffs appear to admit as much. They argue that "Roto-Rooter is free to point to individual records in an effort to prove that a particular query does not identify shaving." This is exactly the concern that made the Court skeptical at the class certification stage. Defendants' right to proffer innocent explanations for modified time entries, whether through other record evidence or testimony, will almost inevitably result in mini-trials on each instance of alleged time-shaving.

Allowing plaintiffs to address this concern through amending their queries and revising their interrogatory responses would not necessarily solve the problem. Plaintiffs are correct that they can base many of the appropriate modifications to their queries on Roto-Rooter's records, but doing so would not necessarily obviate the need for individualized testimony on other innocent explanations, including innocent explanations that defendants have yet to uncover based on their limited review of a sample of entries in Exhibits A and A2. Although discovery responses may be amended, discovery has closed and the timing of the parties' summary judgment motions was tied to plaintiffs' responses to the interrogatories at issue. If the modifications plaintiffs propose to make could have been gleaned from Roto-Rooter's records, plaintiffs should have conducted additional analysis or discovery, perhaps with expert assistance, before having developed their queries. At this late stage, the Court is not inclined to give

plaintiffs what could amount to multiple chances to revise their queries in order to account for all the innocent explanations that defendants might proffer. See Erochina Corp. v. Bissoon, No. 07 Civ. 8696, 2011 WL 3904600, at \*8 (S.D.N.Y. Aug. 26, 2011) (observing that contention interrogatories "are 'designed to assist parties in narrowing and clarifying the disputed issues' in advance of summary judgment practice or trial"); Wechsler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294, 1999 WL 672902, at \*2 (S.D.N.Y. Aug. 27, 1999) (noting that answers to contention interrogatories "are treated by courts in this Circuit as 'judicial admissions' that generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses.")

There is, however, an exception to the foregoing for evidence of "temporal impossibilities" identified by Query 4. Although Sander only applied that Query to the Hartford branch, the Court perceives no reason why Sander is not competent to testify about the Query generally and why it is an appropriate method of identifying time-shaving. Additionally, defendants have not identified any innocent explanations for the kinds of "temporal impossibilities" targeted by Query 4 – ones in which the records show that the job was performed before it was called in by the customer. Thus, the cases relied on by defendants to argue for decertification of the entire time-shaving claim are inapposite with regard to Query 4. See Doyel, 2010 WL 3199685, at \*4 (denying certification of a class when there was no class-wide basis on which to distinguish between legitimate and illegitimate reasons for altering time records); Baas v. Dollar Tree Stores, Inc., No. C 07-3108, 2008 WL 5273724, at \*2 (N.D. Cal. Dec. 19, 2008) (same).

Although defendants have successfully called into question much of plaintiffs' proposed trial plan, with regard to Query 4, the plan appears to remain viable. The Court recognizes that,

even limited to Query 4, the presentation of evidence may be laborious and time-consuming, but, as the parties know, "clockwatching is not very helpful in ascertaining whether class-action treatment would be desirable in a particular case." 7 Charles Alan Wright, et al., Federal Practice & Procedure § 1778 (3d ed. 2012).

Therefore, the Court grants in part defendants' motion to decertify the FLSA collective action and the state class actions on the time-shaving portion of the Uncompensated Hours Claims. The FLSA collective action and the state class actions, however, remain certified with regard to instances of alleged time-shaving identified by Query 4.

C. The Uncompensated Hours Claims Based on "Turn-In" Time

The other remaining portion of plaintiffs' Uncompensated Hours Claims relates to defendants' alleged failure to compensate them for "turn-in" time – the weekly process during which technicians "reconcile their invoices, receipts, and expenses and present them to their branch office." Plaintiffs allege that "turn-in" time is the only time that many technicians go to the branch office and that, for all technicians, "turn-in" had to be done outside of their scheduled working hours at least sometimes. Further, during "turn-in," technicians frequently perform other job-related tasks such as replenishing their supplies, taking inventory of their vans, and attending trainings.

At the class certification stage, the Court found that "[t]he evidence shows that turn-ins . . . are sufficiently common to all the branches, even if there is some variation in their duration." See Class Certification Order, at 17-18. Additionally, the Court approved of plaintiffs' plan to prove their "turn-in" claim by generalized proof, specifically that:

> The turn-in documents are time-stamped to reflect when they are first printed;
> defendants' other records also provide the time when, after a technician reviews
> the turn-in material, he submits those documents. That time, plaintiffs explain,
> can then be compared against defendants' payroll records to see if each plaintiff

was on the clock for these activities. . . . [T]he inquiry is individual in part, requiring individualized proof to show when a class member was off-the-clock, but it will be proven efficiently – *i.e.,* with the addition of each class member's claim not greatly altering the amount of proof to be weighed by the jury.

Id. at 18.

As with other claims, defendants presented plaintiffs with a contention interrogatory that asked plaintiffs to "[i]dentify the date and time of each instance that [a] plaintiff performed 'turn-in' that he contends was not accurately recorded in his time records as working time." In response, plaintiffs produced a spreadsheet listing all 1,827 instances of allegedly unrecorded "turn-in" time ("Exhibit B").

Based on their review of Exhibit B, defendants first argue, as they did with regard to the time-shaving claim, that the "turn-in" claim should be decertified because a significant number of the Discovery Plaintiffs (approximately 15%) do not claim that they performed "turn-in" work that was not recorded as working time. Further, within various class states, some technicians – including technicians working in the same branch – assert a claim for unrecorded "turn-in" time while others do not and there is substantial intra-state disparity regarding the number of instances of unrecorded "turn-in" time alleged. For the reasons discussed in the context of the time-shaving claim, the Court is not persuaded by this argument because it does not undermine plaintiffs' ability to establish their "turn-in" time claims through common proof. Moreover, the variation is readily explainable; for some technicians, "turn-in" fell in the middle of their regularly scheduled work hours, so their "turn-in" time would have been compensated.

Defendants also contend that 570 of the entries on Exhibit B correspond to a week in which that technician worked fewer than 37 hours. Since it is undisputed that "turn-in" took at most three hours (and often far less), defendants argue that these entries cannot support an overtime claim based on "turn-in" time and demonstrate that Exhibit B is unreliable. But, as

with the analogous argument in the context of the time-shaving claim, defendants have demonstrated, at most, that Exhibit B is over-inclusive, not that it is unreliable. Moreover, plaintiffs persuasively argue that defendants' criticism is premature. It is possible that, if a jury finds that Roto-Rooter otherwise shaved a technician's hours, the allegedly uncompensated "turn-in" time that appears inadequate to support liability when viewed in isolation would support liability when viewed in conjunction with potentially shaved hours.

Defendants further argue that individual inquiries as to whether the "turn-in" time will result in an overtime violation will nonetheless be inevitable because the evidence does not suggest "turn-in" took a standard amount of time. Rather, the length of "turn-in" time varied widely between branches and technicians, according to defendants. Not only is this argument premature, for the reasons just explained, but plaintiffs can also adduce generalized proof on this point through representative testimony by a technician from each state. Moreover, Roto-Rooter has kept electronic records of the length of "'turn-ins" since 2010 and plaintiffs can present these records as suggesting a reasonable estimate for the length of "turn-in" time. Where, as here, the employer evidently failed to keep accurate records of compensable working time, a plaintiff may "submit sufficient evidence from which violations of the [FLSA] . . . may be reasonably inferred." Reich v. So. New England Telecomms. Corp., 121 F.3d 58, 66 (2d Cir. 1997) (quoting Martin v. Selker Bros., Inc., 949 F.2d 1286, 1296-97 (3d Cir 1991)).

Also, plaintiffs do not face a similar evidentiary hurdle with regard to the "turn-in" claim as they did in the context of the time-shaving claim. Although Exhibit B from plaintiffs' interrogatory responses would not be admissible, plaintiffs do not need to rely on Exhibit B at trial. Instead, plaintiffs plan to establish their "turn-in" claims through testimony from Sander. Plaintiffs will ask Sander to compare two kinds of Roto-Rooter records, time records and records

generated during or in connection with the "turn-in" process, to determine if a technician was on-the-clock during "turn-in." Unlike plaintiffs' queries concerning the time-shaving claim, this method directly demonstrates violations and does not rely on inference.

Defendants have, however, identified – and plaintiffs have admitted to – an error in Exhibit B. Defendants highlight 252 entries in Exhibit B that correspond to a time when the technician was actually on-the-clock. Plaintiffs explain that this error was a result of their using an incomplete set of Roto-Rooter time records to generate Exhibit B. When plaintiffs re-ran their analysis with the correct set, the 252 challenged entries dropped out. Thus, defendants have not demonstrated an infirmity in plaintiffs' methodological approach. Nor are defendants prejudiced because plaintiffs did not need to rely on Exhibit B and plaintiffs' correction only reduces the number of allegedly uncompensated "turn-in" instances at issue.

In their final attempt to convince the Court to decertify the "turn-in" claims, defendants make one more effort to create individualized issues. They claim that one document created in connection with the "turn-in" process, the Detailed Listing of Time, can be, and often was, printed hours before the "turn-in" took place. Even though that may be true, plaintiffs also rely on another document, the Preliminary Drivers Report, which Roto-Rooter policy requires to be printed at "turn-in." Unlike the Detailed Listing of Time, defendants have not argued that the Preliminary Drivers Report was not, in fact, printed at "turn-in." Thus, plaintiffs may still prove their claim without individual issues predominating. Defendants also claim that 40 entries on Exhibit B do not plausibly suggest uncompensated "turn-in" time because they occur at 11:59 PM when the offices are closed and "turn-in" is unlikely to occur. Defendants are free to make this argument, which may very well be successful as to those 40 entries, to the jury. The argument only makes liability on a number of the "turn-in" instances less likely; it does not call

into question plaintiffs' ability to establish the claim through collective proof. Accordingly, the Court denies defendants' motion to decertify the FLSA collective action and the state class actions on the "turn-in" time portion of the Uncompensated Hours Claims.

## VII. Class Representatives and Discovery Plaintiffs

As discussed, plaintiffs have listed in exhibits to their interrogatory responses instances which they claim support defendants' liability on the Business Expense and Uncompensated Hours claims. But, as defendants have shown, for a number of Discovery Plaintiffs, including some class representatives, there are no entries for certain claims. Defendants urge the Court to decertify the classes for which the class representative is unable to assert a claim. Defendants cite cases from the class certification stage where a court declined to certify a class at least in part because the class representative did not suffer from the same injury as the rest of the class. See, e.g., Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 64 (S.D.N.Y. 2006) (denying class certification because the class representative could not satisfy the typicality requirement as he was not harmed by the alleged misrepresentations/omissions that he alleged injured the class).

But, as plaintiffs correctly point out, a different inquiry is conducted when classes are already certified. "The Second Circuit has noted that, following certification of a class, 'whenever it later appears that the named plaintiffs . . . [are] otherwise inappropriate class representatives,' 'a district court *may*' but 'need not' decertify a class 'if it appears that the requirements of Rule 23 are not in fact met.' McAnaney v. Astoria Fin. Corp., No. 04-CV-1101, 2007 WL 2702348, at *13 (E.D.N.Y. Sept. 12, 2007) (quoting Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982) (emphasis and alterations in McAnaney). Instead, when the initial certification was proper, the claims of the class members "would not need to be mooted or

destroyed because subsequent events . . . had undermined the named plaintiffs' individual claims." Id. (internal quotation marks omitted).

Here, the initial certification was proper and, for all the reasons set forth above, the certification of the remaining claims is proper. In such circumstances, courts allow plaintiffs an opportunity to substitute representative plaintiffs. See Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 253 (2d Cir. 2011) ("Moreover, if, for some reason it is later determined by the court that the representative Plaintiffs are inadequate, the court could substitute another class plaintiff for the representative plaintiff in question or simply allow the remaining representative Plaintiffs to proceed with the class action."); McAnaney, 2007 WL 2702348, at *13 (affording "plaintiffs' counsel a reasonable period of time for the substitution or intervention of a new class representative."). The Court will likewise afford plaintiffs here a reasonable opportunity to substitute class representatives.[29] Plaintiffs have 90 days from the date of this Order to name new class representatives and defendants will be afforded an opportunity to depose any newly-identified class representatives.

The situation is different, however, with regard to Discovery Plaintiffs. As discussed, at summary judgment, "[t]he time has come" for plaintiffs "to put up or shut up." Weinstock, 224 F.3d at 41. If there is no evidence that a plaintiff – whether a Discovery Plaintiff, a class representative, or both – suffered an alleged injury within the relevant limitations period, that

---

[29] Specifically, plaintiffs must find substitutes for: (1) Jason Castillo to represent the non-dismissed California state class for Business Expense and Uncompensated Hours Claims; (2) Stephen McMahon to represent the Colorado state class for Uncompensated Hours Claims based on time-shaving; (3) Dino Branco to represent the Ohio state class for Uncompensated Hours Claims based on time-shaving; (4) Byron Frazier-Smith to represent the Washington state class for Uncompensated Hours Claims based on time-shaving; (5) Alan Kennedy to represent the Minnesota state class for Uncompensated Hours Claims based on "turn-in" time; (6) Frank Poczok to represent the Illinois state class for Business Expense Claims; and (7) Steven Hess to represent the Indiana state class for Uncompensated Hours Claims based on time-shaving.

plaintiff's claim must be dismissed on summary judgment. Accordingly, the following claims are dismissed:

- The FLSA and state class Uncompensated Hours Claims based on time-shaving are dismissed for plaintiffs McMahon, Hollister, Christie, Hess, Drejaj, Smith, Branco, Frazier-Smith.

- The FLSA Uncompensated Hours Claims based on time-shaving are dismissed for plaintiffs Gorman, Cardwell, Loetscher, and Harris.

- The FLSA and state class Uncompensated Hours Claims based on "turn-in" time are dismissed for plaintiffs Castillo, Yasuna, Sabas,[30] Hollister, Soto, and Kennedy.

- The FLSA and state class Business Expense Claims are dismissed for plaintiffs Hollister, Poczok, Roseme, Buono, and Villatoro.

- The FLSA Business Expense Claims are dismissed for plaintiffs Castillo,[31] Cardwell, Soto, Najmon, Cain, and Richardson.

## CONCLUSION

Plaintiffs' motion to amend the Class Certification Order [257] and plaintiffs' motion for summary judgment [231] are denied. Defendants' motion for summary judgment and/or decertification of the class and collective actions [235] is granted in part and denied in part as set forth above.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
February 1, 2013

---

[30] A portion of plaintiff Sabas' Uncompensated Hours Claims are also dismissed for Hawaii-specific reasons, as discussed in Section III.A, *supra*. Plaintiffs Castillo's and Yasuna's Uncompensated Hours Claims are also dismissed to the extent required by the Ita release, as provided in Section III.C, *supra*.

[31] A portion of plaintiff Castillo's Business Expense Claims are also dismissed for California-specific reasons, as explained in Section III.C.1, *supra*.